**ROY WILLARD BLANKENSHIP,**

      **Petitioner,**

v.             405CV194

**WILLIAM TERRY, Warden,**
**Georgia Diagnostic and Classification**
**Center,**

      **Respondent.**

# O R D E R

## I. BACKGROUND

Convicted and sentenced to death in a Georgia Superior Court, Roy Willard Blankenship petitions this Court for 28 U.S.C. § 2254 habeas relief. Doc. # 1. The Georgia Supreme Court detailed his crimes:

> In the early morning hours of [3/2/78, Blankenship] left a bar at which he had been drinking and began to walk home. As he walked past the victim's [Sarah Bowen's] upstairs apartment, he decided that he wanted to break in. The victim was a seventy-eight year old female for whom defendant had done repair work. The defendant climbed up a railing to a porch of the victim's apartment where he kicked out the lower pane of a window. After waiting and watching briefly, defendant entered the apartment. The victim, who suffered from a respiratory illness, was sitting in a chair because she had trouble breathing when she slept. The defendant came up behind the victim and grabbed her by placing his hand over her mouth and nose to keep her from screaming. She struggled and fell from the chair; he fell on top of her. The victim became unconscious, and the defendant

> picked her up and took her back to the bed. She was dressed in pajamas, and he pulled her pajama bottoms down and raped the victim. He then dressed and left the victim's apartment the same way that he entered it. Neighbors concerned about the victim due to her poor health eventually discovered her body. The victim had been severely beaten, scratched and bitten. She had been forceably raped, and a plastic bottle was found inserted in her vagina. She had suffered severe trauma to her oral cavity although forensic evidence could not establish oral sodomy.

*Blankenship v. State*, 247 Ga. 590, 590 (1981).

Before this Court the parties agree on the following procedural history:

> ! 1980: Jury trial resulting in a judgment of conviction and sentence of death for felony murder in violation of O.C.G.A. § 16-5-1; rape in violation of O.C.G.A. § 16-6-1; and burglary in violation of O.C.G.A. § 16-7-1.

> ! 1981: On direct appeal, the Georgia Supreme Court affirmed Blankenship's convictions for felony murder and rape, but reversed his conviction for burglary, holding that it was the first in a series of felonies that led to the victim's death, so it merged with the felony murder conviction. The court also vacated Blankenship's death sentence because of improper juror exclusion under the standards announced in *Witherspoon v. Illinois*, 391 U.S. 510 (1968). *Blankenship v. State*, 247 Ga. 590 (1981).

> ! 1982: Upon retrial on sentencing only, Blankenship was again sentenced to death.

▪ 1983: The Georgia Supreme Court vacated that sentence because the trial court impermissibly restricted evidence in mitigation of punishment at the sentencing phase. *Blankenship v. State*, 251 Ga. 621, 624 (1983) (evidence of defendant's guilt or innocence cannot be excluded in the penalty phase, even though a guilty verdict was rendered in the guilt/innocence phase). That court thus remanded for another resentencing.

▪ 1986-1988: The re-sentencing jury returned a sentence of death, and the judgment entered on it was affirmed by the Georgia Supreme Court. *Blankenship v. State*, 258 Ga. 43 (1988).

▪ 1989: Blankenship filed his first state habeas petition.

▪ 1990: State habeas court conducted an evidentiary hearing. Doc. # 7-69, 7-70 & 7-71.[1]

▪ 1991: The state habeas court denied that petition, doc. # 7-78, and Blankenship unsuccessfully appealed to the Georgia and U.S. supreme courts. *Blankenship v. Zant*, 503 U.S. 962 (1992).

▪ 1993: Blankenship filed for federal habeas relief from this Court. But shortly thereafter the Georgia Supreme Court overruled part of *Blankenship v. State*, 247 Ga. 590 (1981), in *Thompson v. State*, 263 Ga. 23, 25-26 (1993), *disapproved on other grounds*, *McClellan v. State*, 274 Ga. 819, 820-21 (2002). This ruling, Blankenship then argued, created a new state-law remedy that, respondent agreed, should be exhausted in state habeas court. Accordingly, this Court dismissed his petition without prejudice. *Blankenship v. Zant*, 493CV038, doc. ## 20-21 (S.D.Ga. 3/16/93) (unpublished).

▪ 1993: Blankenship filed his second state habeas petition.

▪ 2000: He amended it.

▪ 2001: The state habeas court held a hearing on respondent's motion to dismiss. Doc. # 7-101.

▪ 2003: That petition was dismissed as successive. Doc. # 7-112.

▪ 2003-05: Blankenship exhausted his appeal of that dismissal through the U.S. Supreme Court. *Blankenship v. Head*, 545 U.S. 1150 (2005).

▪ Late 2005: Petitioner filed his "first" (*i.e.* now to be considered on the merits)

[1]  A note about the record: The Court has had its Clerk scan the entire state court record of this case into the Court's CM/ECF, online docketing system. Doc. ## 7, 16, 22. The CM/ECF software "sceen imprints" (*i.e.*, it is visible onscreen and, per user-choice, on hard-copy print-out) its own page numbers at the top of each page of, for example, a filed brief or transcript. The title pages of documents are often not paginated by litigants, however, yet CM/ECF counts a title page as "page 1." So sometimes "CM/ECF pagination" will be off by a page or two when compared to the document's actual printed page. Because the public can access this Court's docket, and the CM/ECF page numbers are easier to read, the Court hereafter will cite only to the CM/ECF page numbers for each document referenced herein, though it occasionally will also reference a printed page. Finally, doc. # 7, resp. exh. 35, 59-61, consists of federal court records located in the *Blankenship v. Zant*, 493CV038 (S.D.Ga.) file, not this case's file/docket. Note also that on this Court's CM/ECF docket "doc. # 7" has subparts (*e.g.*, doc. # 7-9 means CM/ECF document # 7, part 9, which, on its first printed page, is labeled "Respondent's Exhibit No. 3").

federal habeas petition before this Court.

! 2006: This Court granted Blankenship leave to proceed *in forma pauperis*, appointed him counsel pursuant to 21 U.S.C. § 848(q)(4)(B), waived its page-limitation requirements and illuminated its liberal reply brief policy (unlimited), then directed the parties to say everything they have to say in comprehensive briefs. Doc. # 8 at 5; *see also* doc. ## 10, 13.

! 2006: Partially granting petitioner's requested continuance in light of his counsel's health problems, the Court revised the briefing schedule, then directed Blankenship to show (1) why respondent should not prevail on his various procedural and other defenses; and (2) why Blankenship should prevail on the merits. Doc. # 10 at 1 n. 1.

! 2006-07: Petitioner renewed his motion for discovery, which this Court denied, doc. # 20 (motion for reconsideration pending, doc. # 21), while in the meantime the parties filed briefs through 2007 (the Court has encouraged them to file as many briefs as they want, doc. # 8 at 5; doc. # 13 at 2 (noting this Court's virtually unlimited reply brief policy)).

Doc. ## 1, 6, 8, 9, 13, 14, 17, 19. Thus, there can be no reasonable claim here that anyone has been prevented from fully briefing the claims and defenses in this case.

## II. ANALYSIS

### A. Claims Summary

Blankenship presents a variety of claims spread over 128 petition pages and 330 pages of briefing. Doc. # 1 at 12-140; # 12 at 1-17; # 14 at 1-185; *see also* doc. # 15 (100 page response brief). They include a *Brady*[2] claim, doc. # 1 at 12-21; an evidentiary error that, he contends, rendered his 1986 retrial fundamentally unfair, *id.* at 22-23; a grand jury underrepresentation claim, *id.* at 24-27; a prosecutorial misconduct claim, *id.* at 28-34; an erroneously admitted confession claim, *id.* at 35-48; a flawed guilt/innocence jury charge claim, *id.* at 49-56; a flawed sentencing charge claim, *id.* at 57-70; an underfunding (for expert assistance) claim, *id.* at 70-80; ineffective assistance of counsel (IAC) claims,[3] *id.* at 80-110; a *Witherspoon*-based[4] and other defective jury-selection claims, *id.* at 110-129; an "inflammatory photographs" claim, *id.* at 130-131; a "criminal history" claim, *id.* at 131-32 (*i.e.*, that the guilt/innocence and sentencing juries were erroneously misled into believing that Blankenship had a significant criminal history when in fact he did not); a claim that the trial court improperly restricted mitigation evidence, *id.* at 133-36; and, finally, a claim that executing him after spending over a quarter century on death row would violate the Eighth Amendment. *Id.* at 137-40.

---

[2] *See Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1310-11 (11th Cir. 2005) (explaining *Brady* claims); *see also Gilliam v. Secretary for Dept. of Corrections*, 480 F.3d 1027, 1032-33 (11th Cir. 2007).

[3] *See infra* Part II(D).

[4] *See Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (a death sentence "cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction"); *see also Uttecht v. Brown*, 127 S.Ct. 2218, 2229 (2007).

## B. Procedural Evolution

In the decades since Blankenship's final conviction, 28 U.S.C. § 2254's procedural requirements have grown more stringent and complex. This case in many ways illuminates that development.[5] The parties argue over whether some of petitioner's claims are exhausted (*i.e.*, it has been presented on the merits to the state courts), defaulted (the state courts will not consider a claim because, for example, the defendant failed to timely object or raise it on direct appeal), or otherwise barred from consideration here on the merits. Doc. ## 12, 14, 15. The State, for that matter, reminds this Court that it must presume correct any state court factual determinations.[6] Doc. # 6 at 2. It

then argues that: (a) Blankenship is not entitled to an evidentiary hearing,[7] *id.* at 3-4, 20; (b) various claims are unexhausted[8] but cannot now be exhausted, so they are now procedurally defaulted,[9] *id.* at 10-12; and (c) other claims are

---

[5] Because Blankenship filed the instant habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996) (the "AEDPA"), this Court must review his claims under the AEDPA standards. *Davis v. Jones*, ___F.3d ___, 2007 WL 3293300 at * 10 (11th Cir. 11/8/07); *cf. Jefferson v. Terry*, 490 F.Supp.2d 1261, 1280 (N.D.Ga. 2007) (applying pre-AEDPA standards to pre-Act filed federal habeas petition) (*Jefferson* II), *cross-appeals pending, Jefferson v. Hall*, 07-12740, 07-12502 (11th Cir. 2007). The AEDPA established a substantially higher threshold for habeas relief with the acknowledged purpose of reducing delays in the execution of state and federal criminal sentences. *Schriro v. Landrigan*, 127 S.Ct. 1933, 1939-40 (2007) (quotes and cite omitted). State-court decisions thus are given the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

[6] Under 28 U.S.C. § 2254(d)(2), "State-court factual findings ... are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence. § 2254(e)(1)." *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (quotes and cite omitted); *Puente v. Mitchell*, 2006 WL 618595 at * 22-23 (N.D.Cal. 3/10/06) (unpublished) (collecting cases on federal habeas-review standards); *Stephenson v. Kemp*, 2007 WL 2874319 at * 4 (S.D.Ga. 9/26/07) (unpublished) ("If the record provides any support for a state court's factual findings, this Court may not set aside

those findings unless and until they are rebutted by clear and convincing evidence").

Yet, AEDPA-deference to state-court factual findings does not imply an outright abdication of federal judicial review. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief").

[7] If the record refutes the petitioner's factual allegations or otherwise precludes habeas relief, no evidentiary hearing is required. *Schriro*, 127 S.Ct. at 1940.

[8] *See Garza v. Quarterman*, 2007 WL 2913315 at * 6-7 (W.D.Tex. 10/5/07) (unpublished) (exhaustion criteria). Normally, a federal habeas petition containing both exhausted and unexhausted claims is a "mixed petition" requiring dismissal without prejudice so that the petitioner can present his unexhausted claims to the state courts and thus the state retains its primacy in this process. 28 U.S.C. § 2254(b)(1)(A); *Wenger v. Frank*, 266 F.3d 218, 223 (3d Cir. 2001).

[9] "A habeas claim has been procedurally defaulted when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Taylor v. Horn*, 504 F.3d 416, 427 (3rd Cir. 2007) (quotes and cite omitted); *Mize v. Terry*, 2006 WL 668217 at * 1 (M.D.Ga. 3/15/06) (unpublished) (detailing the Eleventh Circuit's procedural-default jurisprudence); *Richey v. Bradshaw*, 498 F.3d 344, 357 (6th Cir. 2007). "[W]here a defendant procedurally defaults a claim, he must show cause for, and actual prejudice from, any alleged error." *DiPietro v. U.S.*, 2007 WL 2983887 at * 2 (11th Cir. 10/15/07) (unpublished). "A defendant may avoid the need to show cause and prejudice on a procedurally defaulted claim by raising a substantive issue of [IAC] for failure to assert the claim." *Id.* Otherwise, IAC can be shown to constitute cause, but a petitioner will still be required to prove prejudice in order to excuse the default. *Id.* (citing *Eagle v. Linahan*, 279 F.3d 926, 937, 938 (11th Cir.

flat-out procedurally defaulted (*i.e.*, they were presented to the state courts, deemed procedurally defaulted there, and thus must be deemed likewise here). *Id.* at 12-16; *see also* doc. # 15 at 13-18. Finally, even if a claim has been exhausted and survives procedural default, Blankenship must surmount a final hurdle -- that it does not involve a new rule of law that otherwise cannot be retroactively applied.[10]

---

2001)). In extraordinary cases, however, a federal habeas court may grant a habeas petition on a procedurally defaulted claim without a showing of cause and prejudice to correct a fundamental miscarriage of justice. *Jones v. Campbell*, 436 F.3d 1285, 1304 (11th Cir. 2006).

Finally, where a federal habeas corpus petition contains "mixed claims," *i.e.*, some exhausted, some not, but the unexhausted claims are procedurally barred by the state courts, it is not a mixed petition requiring dismissal. In that situation the district court, while unable to reach the merits of the barred claims, must decide the merits of the exhausted, unbarred claims. In such a situation, where the unexhausted claims may not have been presented to the highest state court, an exhaustion effort will be considered futile in that the state court would find the claims procedurally defaulted. *See Garza*, 2007 WL 2913315 at ** 9-10; *Wenger* 266 F.3d at 223; Ann., 43 A.L.R.FED. 631 (*Propriety of federal court's considering state prisoner's petition under 28 U.S.C.A. § 2254 where prisoner has exhausted state remedies as to some, but not all, claims in petition*) (1979).

[10] As another court recently explained:

> The general rule is that new rules of criminal procedure "should always be applied retroactively to cases on direct review, but that generally they should not be applied retroactively to criminal cases on collateral review." *Teague v. Lane*, 489 U.S. 288, 303, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). A new rule of constitutional law will be applied, however, if it is a "substantive or a watershed rule of procedure that affects the fundamental fairness and accuracy of the criminal proceeding." *Guzman v. United States*, 404 F.3d 139, 140 (2d Cir.2005) (internal

## C. State-Federal Claims Management

An additional layer of complexity surfaces in claims management -- the way two different court systems (state and federal) manage the same claim. Sometimes state courts choose not to resolve claims in light of resolution of other claims. Or, they deny "all claims" without saying what they are. Or, they say what they are but supply no reason for the denial, thus forcing federal courts to wonder, if not guess at, a ruling's rationale. *See, e.g., Wood v. Schriro*, 2007 WL 3124451 at * 4 (D.Ariz. 10/24/07) (unpublished) (application of the comity-based, federal standards "presents difficulties when the state court decided the merits of a claim without providing its rationale") (unpublished). Saying "after reviewing XYZ claim, we conclude that it is without merit" -- thus failing to explain *why* it is without merit -- says very little.

When brevity is advanced at the expense of clarity, federal courts obviously struggle to uphold comity concerns. Again, federal courts are not authorized to overturn state court judgments absent the high-standards required by federal habeas procedural law. *See, e.g.*, 28 U.S.C. § 2254(d)(1) (limiting this court's power to grant habeas relief to state court decisions that "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,[11] as determined

---

quotation marks omitted).

*U.S. v. Petrie*, 2007 WL 2884368 at * 4 (N.D.Fla. 9/27/07) (unpublished).

[11] Legal principles are "clearly established" when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its

by the Supreme Court of the United States") (footnote added); *Schriro*, 127 S.Ct. at 1939 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold"). But a state court's failure to explain *why* it denied a habeas claim derails the downwind federal court's effort to show deference toward that decision -- especially if the claim was summarily or "impliedly" denied.[12] This was recently illuminated by another federal court:

> In reviewing the rulings of the state habeas corpus court, the Supreme Court of Georgia affirmed the dismissal of [a death-row petitioner's] claims in a *summary* fashion. [*Jefferson v. Zant*, 263 Ga. 316, 320 (1993) (*Jefferson I*)] ('The judgment denying habeas relief is affirmed for reasons contained in the court's final order....'). Petitioner has raised some of these claims in this federal habeas corpus proceeding, and the Court addresses them in turn below, as they are *not* insulated from federal review.

*Jefferson II*, 490 F.Supp.2d at 1281

(emphasis added).[13]

Beyond "implied" and "summary" disposition problems, state courts sometimes reach only part of an otherwise squarely presented, relief-supporting claim, then either overlook or simply ignore the rest. *Williams v. Taylor*, 529 U.S. 362, 372 (2000) ("After noting that the [state supreme court on habeas review] had *not addressed* the question whether trial counsel's performance at the sentencing hearing fell below the range of competence demanded of lawyers in criminal cases, the [federal district] judge began by addressing that issue in detail [and later granted IAC-based relief for failure to develop mitigating evidence]") (emphasis added); *id.* at 373-74 n. 5 ("The [state supreme court] *ignored or overlooked* the evidence of [petitioner's] difficult childhood and abuse and his limited capacity") (emphasis added).

---

[12] Some say that on "implied" denials a federal court must independently review "the record to assess whether the state court decision was objectively unreasonable under controlling federal law. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision." *Wood,* 2007 WL 3124451 at * 4 (cites omitted); *accord Brown v. Ornoski,* 503 F.3d 1006, 1010-11 (9th Cir. 2007). Still, a federal court should not have to *guess* about a state court's reasoning, as deference based on speculation simply mocks the very concept of judicial review.

[13] To keep *federal* district courts from engendering the understandable frustration that arises from "implied" and "summary" rulings, the Eleventh Circuit has "exercised [its] supervisory powers to instruct district courts to resolve *all* claims for relief raised in a habeas corpus petition regardless of whether habeas relief is ultimately granted or denied." *U.S. v. Wright*, 131 Fed.Appx. 698, 700 (11th Cir. 2005) (emphasis added) (citing *Clisby v. Jones*, 960 F.2d 925, 935-36 (11th Cir. 1992) (en banc)); *see also Smith v. Secretary, Dept. of Corrections,* 2007 WL 763980 at * 2 (11th Cir. 3/15/07) (unpublished) (remanding to district court to resolve IAC claim "on the merits"). That practice has been criticized, *see, e.g., Robbins v. Smith*, 152 F.3d 1062, 1068 (9th Cir. 1997) ("It has the disadvantage of requiring considerable extra work by the district court to decide many claims that may be completely unnecessary, because they will be mooted on appeal"), *rev'd on other grounds, Smith v. Robbins*, 528 U.S. 259 (2000), but it remains the law of this circuit. *Sanchez v. U.S.*, 2007 WL 2573979 at * 2 (11th Cir. 9/7/07) (unpublished). Unsurprisingly, the practice produces lengthy, time-consuming opinions. *See, e.g., Ford v. Schofield,* 488 F.Supp.2d 1258, 1258-1369 (N.D.Ga. 2007); *Jefferson II*, 490 F.Supp.2d at 1261-1348.

---

decision") (quotes and cite omitted).

As did the state supreme court in *Williams,* the *Jefferson I* court similarly reached only *part* of a dispositive claim, but either "ignored or overlooked" the other part[14] -- the very part that eventually won petitioner Jefferson *federal* habeas relief. *Jefferson II*, 490 F.Supp.2d at 1321-1328 (granting habeas relief, and thus vacating death-penalty judgment, on *unrebutted* testimony produced before the *state* habeas court, which was later overlooked or ignored by the state supreme court); *see also Morales v. Mitchell*, ___ F.3d ___, 2007 WL 3225397 at * 13 (6th Cir. 11/2/07).

Finally, even though federal courts review a state court's *decision* and not its writing quality, *Malinowski v. Smith*, ___ F.3d ___, 2007 WL 4165925 at * 3 (7th Cir. 11/27/07); *Garza*, 2007

WL 2913315 at * 5, deference cannot be based on sheer speculation about what a state court *may* have been thinking. At that point the federal court simply declares the issue unadjudicated, which means the AEDPA review standard is inapplicable. *See, e.g., Morales* 2007 WL 3225397 at * 11 ("While we apply AEDPA deference to the state courts' rulings concerning the merits of a claim, we review *de novo* issues not reached by the state courts"); *Garner v. Mitchell*, 502 F.3d 394, 403 (6th Cir. 2007).[15]

As will be demonstrated *infra*, some of the instant claims also were similarly given short shrift by the state courts. Some, therefore, must be reviewed *de novo*.

Even at that, states may invoke a final line of defense that petitioners like Blankenship must surmount: Even if the state court decision is contrary to clearly established federal law and objectively unreasonable,

---

[14] Some have proffered explanations for this. *See, e.g.,* S.B. Bright & P.J. Keenan, *Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases*, 75 B.U.L. Rev. 759, 804 (1995) (citing *Jefferson I*, 263 Ga. at 316-17 (order denying habeas corpus petition was not reviewable under less deferential standard than usual "clearly erroneous" standard, though court adopted State attorney's proposed final order verbatim, where order was well-supported by citations to record and judge adopted order as his own)); *see also Gibson v. Turpin*, 270 Ga. 855, 867 (1999) ("The habeas court's adoption of a final order drafted by the state was not error"); doc. # 12 at 17 (Blankenship complains that the same "adoption" has occurred in this case, too, and he reminds this Court of *Chudasama v. Mazda Motor Corporation*, 123 F.3d 1353, 1373 n. 46 (11th Cir. 1997) (a judge's practice of delegating the task of drafting sensitive, dispositive orders to counsel, and then uncritically adopting the orders nearly verbatim would belie the appearance of justice and create the potential for overreaching and exaggeration on the part of the attorney preparing findings of fact)). Of course, *Chudasama's* remonstrance is not binding upon state courts. Yet, such judicial abdication (*i.e.,* signing *unchanged* opinions written by an *advocate*) obviously undermines and artificializes the very respect Congress commands federal courts to show to state court opinions. *See also Corporate Management Advisors, Inc. v. Boghos*, 756 So.2d 246, 248-49 (Fla.App. 5 Dist. 2000).

[15] As the *Garner* court explained:

> Given the one-sentence, unreasoned disposition of Garner's ineffective-assistance-of-counsel claim, it is impossible for us to determine what the Ohio Court of Appeals decided regarding the merits of Garner's underlying *Miranda* claim-or even if it made any decision at all-much less for us to give deference to that decision.... *Cf. Danner v. Motley*, 448 F.3d 372, 376 (6th Cir.2006) (applying *de novo* review because "[t]here is no indication in the [state] trial court's comments that it examined [the claim at issue]"). Accordingly, we review Garner's *Miranda* claim *de novo*.

*Garner*, 502 F.3d at 405.

the reviewing federal court must *still* determine whether the error is harmless within the meaning of *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *Fry v. Pliler*, --- U.S. ----, 127 S.Ct. 2321, 2327-28, 168 L.Ed.2d 16 (2007) (noting that AEDPA "sets forth a precondition to the grant of habeas relief ..., not an entitlement to it," and that "in § 2254 proceedings a [federal] court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht"). *Brecht* applies "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*], 386 U.S. 18[, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ]." *Id.* at 2328.

*Ferensic v. Birkett*, 501 F.3d 469, 472 (6th Cir. 2007) (emphasis added). Thus harmlessness here is to be judged under *Brecht's* "substantial and injurious effect standard," instead of under the harmless beyond a reasonable doubt standard applied by *Chapman v. California*, 386 U.S. 18 (1967). *Hodges v. Attorney General, State of Fla.*, ___ F.3d ___, 2007 WL 3307014 at * 5 (11th Cir. 11/9/07).

### D.  IAC Standards

The U.S. Supreme Court has insisted that (a) the death penalty must be limited to a narrowly defined class of cases; (b) such defendants must be permitted to present mitigating circumstances during the sentencing phase of the State's case against them; but (c) how much and what kind of mitigation evidence to present is a lawyer's decision -- to which courts must afford deference -- *if* counsel made reasonable efforts to first investigate mitigation evidence that would inform that judgment.

Judicial line-drawing delineates what constitutes a reasonable judgment and a reasonable investigation.  Cases typically go off the rails because substandard, *trial*-level defense lawyers fail to unearth the same information that is easily retrieved and effectively presented by competent *habeas* lawyers downwind.  *Schofield v. Gulley,* 279 Ga. 413, 415 (2005) ("In contrast to defense counsel's preparation for trial, habeas counsel pursued several fairly obvious avenues of investigation which proved fruitful"); *id.* at 416 ("[W]e ... conclud[e] that trial counsel's deficiencies ... [demonstrate] enough actual prejudice to require a new sentencing trial"); *Morales*, 2007 WL 3225397 at * 11-19.

This phenomenon often enough shows up in a trial lawyer's failure to investigate mitigation evidence, where many defendants' childhood-maladies and victimizations are explored.  *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (under *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny, the decision of counsel not to expand their investigation of petitioner's life history for mitigating evidence for penalty phase of petitioner's murder trial beyond presentence investigation report and department of social services records fell short of prevailing professional standards in capital cases, as required to support claim of ineffective assistance; despite well-defined norms which provided that investigation into mitigating evidence should have comprised efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources); *Williams,* 529 U.S. at 367-99; *Taylor*, 2007 WL

2728668 at * 31; *Collier v. Turpin*, 177 F.3d 1184, 1200-04 (11th Cir. 1999) (counsel's performance at sentencing phase of capital murder trial was deficient for purpose of defendant's claim that he received IAC, where counsel's examination of witnesses was minimal, and counsel presented almost none of readily available mitigating evidence regarding defendant's background and character, including testimony regarding defendant's upbringing and his mental and physical ailments).

But it also shows up in the failure of counsel to pretrial-investigate aggravation evidence. *Rompilla v. Beard,* 545 U.S. 374, 377 (2005) ("We hold that even when a capital defendant's family members and the defendant himself suggest that no mitigating evidence is available, his lawyer must make reasonable efforts to obtain and review material that he knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial"); *see also id.* at 383-90 (defense counsel's failure to examine file on defendant's prior conviction for rape and assault at sentencing phase of capital murder trial fell below the level of reasonable performance, as required for ineffective assistance of counsel; counsel knew that the prosecution intended to seek the death penalty by proving defendant had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law, and, further, knew that the prosecution would attempt to establish this history by proving defendant's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in the earlier trial).

In both cases, however, a habeas petitioner must show prejudice. *Rompilla,* 545 U.S. at 390-93; *Brown,* 503 F.3d at 1014 (defense counsel's failure to discover that capital murder defendant was physically abused by his aunt,

and failure to present such information to the jury during the penalty phase, did not prejudice defendant, and thus could not amount to ineffective assistance; no information was provided regarding the severity or frequency of the beatings, jury had already heard through psychiatrist that defendant claimed to have been physically abused by his mother, and jury had information regarding defendant's rape of another young girl and defendant's prior voyeuristic sexual incident involving another young girl); *Schofield,* 279 Ga. at 416 (counsel's failure to investigate and present mitigation evidence that defendant had saved lives of coworker and woman who had attempted suicide created reasonable probability that result of sentencing hearing for capital murder, namely, death sentence, would have been different, as required to support claim of ineffective assistance of counsel).

Of course, defense counsel are not required by *Strickland* to present mitigating evidence at sentencing in every case. *Wiggins,* 539 U.S. at 533. But if defense counsel decides not to investigate mitigation, that "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins,* 539 U.S. at 521-22 (quoting *Strickland,* 466 U.S. at 691); *Hannon v. Secretary, Department of Corrections,* 2007 WL 3119632 at * 5 (M.D.Fla. 10/23/07) (unpublished).

The *Strickland* court parsed the gradations of what constitutes a reasonable investigation:

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to

the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91; *see also Morales,* 2007 WL 3225397 at * 12-13; *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007); *Harrison v. Quarterman*, 496 F.3d 419, 425-30 (5th Cir. 2007) (IAC-based, limited habeas relief granted on counsel's failure to interview and investigate potential eyewitnesses); *Jennings v. McDonough*, 490 F.3d 1230, 1244 (11th Cir. 2007); *Curry v. Burge*, 2007 WL 3097165 at * 13-16 (S.D.N.Y. 10/23/07) (unpublished) (collecting IAC-investigation based cases).

Finally, the Eleventh Circuit recently summed up how post-*Wiggins* district courts should evaluate pre-sentencing investigation by counsel like Blankenship's:

In preparing for a capital case, an attorney does have a duty to conduct a reasonable investigation into possible mitigating evidence. A total failure to investigate the defendant's past or present behavior can qualify as deficient performance under *Strickland.* However, effective assistance does not require that counsel investigate and present all evidence in mitigation. The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of

counsel. As a result, it is not ineffective assistance to fail to present redundant evidence. To assess the prejudice caused by counsel's alleged ineffective assistance at the penalty phase of a capital trial, we reweigh the evidence in aggravation against the totality of available mitigating evidence. The totality of the available mitigating evidence includes both evidence introduced at trial and the evidence introduced in the habeas proceeding.

*Jennings,* 490 F.3d at 1244 (quotes and cites omitted); *see also id.* at 1243 (because effectiveness is an objective standard, trial counsel's tacit admission that his performance was deficient "matters little"); *Marquard v. Secretary for Dept. of Corrections*, 429 F.3d 1278, 1304 (11th Cir. 2005) (burden of persuasion is on the defendant asserting IAC to prove by a preponderance of the evidence that counsel's performance was unreasonable).

### E. Blankenship's IAC Claims

Blankenship argues that his resentencing counsel -- Penny Haas and John W. Hendrix -- were ineffective for failing to investigate and present relevant and persuasive evidence of his life history in mitigation of the death sentence that he received. This violated his rights, he claims, under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the Georgia Constitution.[16] Doc. # 15 at 4. In that respect, he insists that this IAC claim is properly before this Court because the state habeas courts made

---

[16] " State law claims are not cognizable in federal habeas proceedings and we do not consider them." *Parr v. Quarterman*, 2007 WL 2326153 at * 1 (5th Cir. 8/15/07) (unpublished). Therefore, the Court denies Blankenship's state constitutional claims outright.

no findings on it. Thus, Blankenship concludes, this Court should not apply 28 U.S.C. § 2254(d)(1). *Id.* His main complaint, then, is that his lawyers in effect

> presented a *culpability* phase defense to the *sentencing* phase jury. Given that the issue of guilt had already been determined and Petitioner had already been convicted of this murder ... challenging the defendant's culpability without presenting any other evidence in defense of the death sentence was an unreasonable tactic where compelling mitigation evidence was available.

Doc. # 14 at 8 (emphasis added).

The strategy made no sense, says Blankenship, because it acknowledged that he was in the victim's home that night and placed her on the bed after she fell and struck her head. *Id.* at 8. A strategy that would have made sense, in contrast, would have involved skillfully presenting information about his life-history in mitigation of the death sentence option then before the jury. *Id.* at 8, 55-56 (quoting *Wiggins*, 539 U.S. at 535 ("While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive")).

Blankenship concedes that raising "residual doubt" is a valid tactic, but *not* if counsel fails to couple it with otherwise reasonably available mitigation evidence. Doc. # 14 at 9 ("To put forth doubt as a defense, at the exclusion of all other mitigation evidence, was unreasonable and ineffective given the factual record"); *see also id.* at 54 ("it was unreasonable for defense counsel to focus *exclusively* at the penalty phase on trying to plant some reasonable doubt")

(quotes and cite omitted).

Blankenship says that this failed strategy prejudiced him in multiple ways. First, the prosecutor was able to capitalize on the dearth of mitigation evidence. Doc. # 14 at 10. Second, defense counsel's residual doubt strategy invited the State to (and it did) super-illuminate Blankenship's previous admission to having been in the victim's apartment, and either attempted to have or had sex with the victim. *Id.* at 11.[17] It also beckoned the prosecutor to argue that the felony-murder aggravating circumstance had already been proven beyond a reasonable doubt. *Id.* On top of that, the jury heard the prosecutor emphasize such "vile" and "inhumane" acts as the product of a depraved mind -- thus proving the second aggravating circumstance Georgia law requires for death. *Id.*

Resentencing counsel's constitutionally deficient performance, Blankenship further contends, is traceable back in time:

---

[17] Blankenship's pretrial statement to the police was admitted, over Blankenship's objection, which was overruled on direct appeal:

> When I put her on the bed and took her clothes off I was drunk I guess. I said I may as well go ahead and get some pleasure. That's when I had the relationship with her. As far as I know I thought I [had entered her vagina].

*Blankenship*, 258 Ga. at 46. Note that at his 1986 resentencing trial, Blankenship did not say those words. Instead, the prosecutor read them to him on cross-examination, and Blankenship never did admit to saying them. Instead, he admitted that the statement was only "partially" true, and emphasized that the police had typed the statement up. Doc. # 7-49 at 34 (paper transcript pp. 474-75); *see also id.* at 481-82 (Blankenship admitted that he said that at his first trial, but now denied it was true. "I've never had sex with Mrs. Bowens"); *id.* at 483.

Long before the trial began, the defense should have recognized and been prepared for the prosecution's argument that the aggravating circumstances had already been proven beyond a reasonable doubt, as Mr. Blankenship had already been convicted and had made incriminating statements about the rape. With the defense case resting entirely on raising doubt about the crime itself, the State, having quickly countered this theory, was left to strongly argue in favor of the death sentence, as there was nothing presented in addition to the facts of the crime for the jury to consider.

Doc. # 14 at 11-12.

Playing the residual-doubt card but pairing it with only a flimsy presentation of mitigation evidence, Blankenship argues, thus constituted ineffective assistance. *Id.* Worse, he says, counsel compounded the error by waiting until the tail end of their closing argument to finally address, and thus marginalize, mitigation:

Roy Blankenship is different in one regard. He is the product of mountains. Mountain people are different. He was born up in one of those valleys up in West Virginia. Now, I don't know exactly where it is but I will tell you how far back up in there it is. When I get letters from his mother and from his sister the post office still uses a hand stamp[ed] cancelled stamp. They don't have a fancy machine up there yet. So I know that he's different because I was born up in one of those valleys up in the mountains up in North Georgia and I know just how far back up in there folks live. He came down here to work. And he got himself a job. It was the only job he had. Apparently he worked pretty hard. He

says so.

Doc. # 22-3, paper pages 502-503; *see also* doc. # 14 at 14. Petitioner argues that this

limited glimpse of Roy Blankenship, a man who came from poor, unsophisticated surroundings, makes clear that had trial counsel conducted any reasonable investigation into the life history of his client, counsel would have offered that information to the jury because it was mitigating and consistent with their theory. Not having conducted an investigation, counsel was limited to the hills of West Virginia where the stamp machines are manual and where mountain men, like Roy Blankenship, who are different, live. In this statement, counsel concedes that there is mitigating evidence pertaining to his client that was available had counsel chosen to develop it. Moreover, such mitigation evidence would have supported the theory and would have been persuasive.

Doc. # 14 at 15.

A reasonable investigation, petitioner maintains, would have unearthed, and counsel thus would have been able to present, substantial mitigating evidence in order to provide the sentencing jury with insight into Mr. Blankenship's life history. *Id.* at 17-18; *id.* at 19-39. He enumerates the following *unrebutted*, *habeas*-court-adduced mitigation evidence *not* responsibly developed and presented by resentencing counsel:

(a) Father Roy was a coal miner, a gambler and a moonshiner, while mother Nellie, a homemaker, suffered hospitalization for "nerves." The couple had four children, two twin girls, Roy Jr.,

and another child who died at birth.

(b) Roy Jr.'s older, twin sisters Pearl and Debbie suffered from chronic paranoid schizophrenia, which on occasion has required hospitalization.

(c) Shortly after returning home from the hospital with the twins, Nellie was severely beaten by Roy Sr., who was drunk at the time. The beating caused her caesarean-incision stitches to rip open, requiring Nellie to return to the hospital.

(d) Roy Jr. was conceived shortly after the birth of his twin sisters. While pregnant with him, Nellie was regularly and severely beaten, shoved and physically abused by Roy Sr. In one instance, Roy Sr. nearly strangled his pregnant wife to death, choking her until she passed out from being unable to breathe. She survived because someone finally stopped him by hitting him in the head with the cover to the family's washing machine.

(e) Roy Jr. also had a difficult birth (12 hours labor, oxygen deprivation) and at that time was very sick with bronchitis. He was placed in an incubator. After he was taken home, he had to sleep in a dresser drawer because his parents couldn't afford a crib. Just days after Roy Jr. got home, his mother put him in his drawer to sleep and his father came along drunk and slammed it shut so hard that the whole dresser tipped backwards. He nearly killed Roy Jr. that time.

(f) Roy Jr. was the smallest and sickest of the children. In light of the problems during pregnancy and birth, it is not surprising that Roy Jr. was constantly sick as a child. In addition to the bronchitis, he had frequent high fevers, sometimes reaching over 104 degrees. Apparently susceptible to illness, Roy Jr. developed pneumonia on five separate occasions during his childhood. Nellie took him to the hospital often for his pneumonia and fevers. On one occasion the doctor told his mother that he might die because he was so sick.

(g) Nellie's final pregnancy was disastrous (the baby died), and she had to spend a very long time in the hospital away from her family, so the children were left with their father.

(h) Roy, Jr. was terrified of his father, who would drink and beat his wife and children for no reason, creating a terribly unstable home environment.

(i) Roy Jr. and the twins were about 9 years old when Roy Sr. and two other members of Nellie's family, including her only sister, were killed by the carbon monoxide poisoning of their motel room. After three simultaneous funerals, Nellie suffered a nervous breakdown and was hospitalized.

(j) Nellie had periods when she did not know who she was or who were her children. At least twice, the children had to call an ambulance to come and get their mother. Seeing their mother in this kind of state traumatized Roy Jr. He did not understand that she was sick, so he would run off to a corner to huddle. Nellie has since been re-hospitalized for other breakdowns.

(k) After Roy Sr.'s death, the family had to move out of the home where they had

been living because the house belonged to Roy Sr.'s mother, who threw them out. The family migrated to different places thereafter, and Nellie would come and go.

(l) Sometime after the death of his father, and his mother's hospitalization, Roy Jr. withdrew from his mother and everyone else. He stayed outside as much as possible, and often when someone spoke to him, he just wouldn't hear them. He became harder to communicate with, withdrawn and isolated. His sisters recall that Roy, Jr. had a difficult start, which he never got over. He remained small in size for a boy, was sick very frequently, spent a lot of time in the hospital as a child and had to repeat school because of his absences. In addition to his fevers and bouts with pneumonia, he frequented the doctor because he was sickly.

(m) Shortly after his father died, Roy Jr. was sodomized by an older, neighbor boy. He was only eight or nine years old. The sodomizer took him down under a nearby bridge to do it. Someone saw him and ran to tell Roy Jr.'s mother. She ran to the bridge and found Roy with his pants down, laying there. She took him home and "whipped the daylights out of him."

(n) Nellie remarried three times after the death of Roy Jr.'s father. The first two stepfathers only brought more turmoil to the family. One beat them and brutalized pets with whom the children, especially Roy Jr., had grown close.

(o) Paul Kirk was the first stepfather. Crazy and cruel, he was more of an alcoholic than Roy Sr. had been. And when he drank, he got "crazier than crazy." He once took an ax to Nellie's wooden bedroom set of furniture, chopping it to pieces while the children hid. He did it because he thought she was sleeping in it with someone else. Another time, while furious, he picked up Roy Jr.'s cage of hamsters and took Roy Jr. outside with him and threw each hamster on a rock to hurt it, then he smashed them with rocks to kill them. Kirk was extremely cruel to Roy Jr.

(p) Kirk also smashed the kids' pet pony's head with rocks, killed their pet guinea pigs, and beat the other animals on the farm. When he got drunk he used to threaten to kill himself or one of the children. He was insanely jealous of their mother. Once he suicidally tried to run the car -- while Roy Jr. and his sisters and mother were in it -- off the edge of a steep bank. Nellie was in the front seat and grabbed the wheel from him just in time.

(q) The children had all seen Kirk hold a gun to Nellie's head and threaten them all. Once Nellie and the children returned home to find Kirk sitting in Roy Sr.'s chair with his rifle propped up under his chin with his toe on the trigger, waiting for them. Nellie told him to just go ahead and kill himself, but he passed out.

(r) Kirk tried to molest one of Roy Jr.'s sisters but was interrupted by Nellie; Roy Jr. was afraid to be alone with Kirk but never told Nellie anything, his sister surmised, given the post-sodomization whipping that Nellie had given him.

(s) After Nellie divorced Kirk (after she found out that Kirk was giving liquor to the kids), the family moved again and she married a man named L.D. Justice.

(t) Justice built a pool room on the side of the family's house so he could make some money. He got drunk one night and robbed the vending machines in his own pool room. He hated Roy Jr. because by then he was getting old enough to physically protect Nellie. Nellie divorced him within months.

(u) Subsequently, the family moved again, and Nellie next married Wilson Flemming. During those years, they had to move frequently, probably ten to fifteen times in order to make ends meet. According to Nellie, Roy Jr. did not adjust well to the different surroundings, schools and people.

(v) Flemming did not like the children and took Nellie away to North Carolina to be with his own family. Pearl, Debbie and Roy Jr., then all in high school, were left behind. With nowhere to go, Pearl got married. Roy Jr. went to live with his grandfather for a while, then lived with Pearl and, with nowhere else to go, dropped out of school and joined the military.

(w) While in the military, Roy Jr. suffered terrible blackout spells with associated memory loss.

(x) After leaving the military, Roy Jr. worked at the Guerry Lumber Company in Savannah, Georgia. Its owner, a well-respected citizen in the community, would have been willing to testify (at the resentencing trial) that Roy Jr. worked hard, got along with others, and took directions well. A part-owner and two co-employees would have similarly testified, including that Roy Jr. worked well with customers, and his behavior and their

knowledge of him made them feel shocked to learn of the crimes charged against him.

(y) The family had a history of mental illness: both of Roy Jr.'s sisters suffer from chronic paranoid schizophrenia, which has required periodic institutionalization, regular medication, and continuing long term treatment to keep the illness regulated and under control.

(z) Nellie believes that Roy Jr. had psychiatric problems similar to those of his sisters. Prior to his second and third resentencing trials, she contacted Haas and Hendrix. She spoke with Hendrix before Roy's final resentencing trial to explain to him that Roy's sisters were paranoid schizophrenic, and in addition that her father's brother was also mentally ill, and in fact lived most of his life in a psychiatric institution. He also suffered from schizophrenia. Hendrix admits this in an affidavit. He also knew, while preparing for trial, that Roy Jr.'s twin sisters had been diagnosed with chronic paranoid schizophrenia, and his maternal uncle had been committed to a state institution in West Virginia, where he remained until his death.

Doc. # 14 at 19-34 (paraphrased); *see also* doc. # 7-123 & # 7-124 (affidavit cluster attached to Resp. Exh. 87, sub-exh. 23-28).

Also at the 1990 state habeas court hearing, Blankenship adduced the following unrebutted affidavit testimony of Dr. Harry Krop, a licensed clinical psychologist, who evaluated him in 3/90. Doc. # 14 at 34. After noting many of the above family history factors, he explored Blankenship's medical history, which

reveals two known head injuries, once when he was about five years old and another when he was involved in an automobile accident as a teenager. He also suffered with pneumonia numerous times. Although he never participated in psychiatric treatment, both his sisters, his mother and several other relatives were hospitalized with a diagnosis of Schizophrenia.

Doc. # 14 at 35. Krop then stated what would have been his testimony had he been consulted by resentencing counsel and asked to testify:

As a very sickly child, [Blankenship] started off in a negative direction. With proper nurturing and parental support, [he] might have been able to overcome the initial physical debilitation. Instead, as set forth above, the negative home environment, which included both abuse and neglect, only exacerbated the effects of his physical problems. As a result, he bec[a]me a withdrawn and lonely child who, from a very early age, lacked self-confidence and came to think of himself as a failure. His illnesses made it impossible for him to partake of the normal age-appropriate peer socialization process since he was so frequently sick at home. With increasing failures, his self concept further deteriorated, resulting in increased feelings of inadequacy and isolation. The absence of any positive male role model in his family also hindered Mr. Blankenship's emotional development and contributed to his inability to develop any significant sense of self-worth.

A child raised in an environment such as Mr. Blankenship's is much more likely, as a result thereof, to exhibit acting out

behaviors in adolescence and adulthood. This can be said generally with a reasonable degree of psychological certainty and specifically, in Mr. Blankenship's case, I state with a reasonable degree of psychological certainty that this has occurred. When Mr. Blankenship was a teenager, he was angry and insecure. At this stage, he was particularly vulnerable to the lure of intoxicants, including alcohol and illicit drugs. Mr. Blankenship started drinking heavily, often in binges, also consuming pills and using marijuana. Although Mr. Blankenship joined the military to avoid the loneliness and feelings of abandonment created by his mother's desertion, he did not find the emotional support needed and began drinking heavier and using drugs more frequently to cope with his emotional conflicts. In addition to the conflict dealing with abandonment, Mr. Blankenship also had identity conflicts related to his masculinity. Having a lack of positive male role models in his life, dealing with authority figures in the military was difficult for Mr. Blankenship. His identity conflicts were also intensified by an episode of sexual abuse as Mr. Blankenship was molested by an adult male neighbor when he was about eight years old.

Mr. Blankenship's drinking and substance abuse is a direct result of his psychological disturbances. Moreover, his disturbance and its effects, become much more pronounced when he is under the influence of intoxicants. During such episodes, his thinking is likely to be very confused, particularly his judgment, which becomes impaired under stress.

Information revealed in the evaluation reveals that he had been drinking heavily and abusing illicit drugs prior to the instant offenses. In this regard, records reflect that Mr. Blankenship consumed about fifteen to twenty drinks and took about nine Methaqualone. As a result of his disturbances, as exacerbated by this heavy drinking and pill-popping, Mr. Blankenship's thought processes at the time of the incident, were, in all likelihood, highly disordered and his judgment was impaired, consequently, his capacity to form intent, was sharply diminished.

Mr. Blankenship's current profile is consistent with a person who is in a state of denial regarding his psychological disturbances. In other words, he tries very hard to appear more normal than he is. The test pattern results gave no indication of malingering.

The MMPI showed that Mr. Blankenship is extremely defensive, a result which is very consistent with my impressions stated herein.

In my practice I have evaluated approximately 150 death row inmates. The vast majority of these individuals present as having the diagnosis of Anti-Social Personality Disorder, also known as sociopathic. Such persons have minimal insight into their behavior and are extremely poor candidates for rehabilitation.

The current evaluation suggests that Roy Blankenship is not sociopathic. His pattern of behavior as a child and adolescent does not support such a finding. He has a good insight into his

behavior and, importantly, his substance abuse problems. The absence of sociopathy should make Roy Blankenship a much better than average prospect for rehabilitation. Also, his near normal intelligence makes rehabilitation more likely. Overall, it is this examiner's opinion that with a reasonable, degree of psychological certainty, Mr. Blankenship shows a fairly good prognosis for change.

My testing did not reveal any specific indications of neuropsychological disease. However, given Mr. Blankenship's history of head trauma, dizziness and blackout spells, a full neuropsychological workup should be undertaken. Also, in order to measure precisely the level of impairment in the processes caused by Mr. Blankenship's alcohol and drug intoxication on the night of the offense, the opinion of a pharmacologist would be helpful.

The opinions and conclusions stated herein could have been made with equal force in 1978, or at any time since then, by myself or any competent psychologist.

Doc. # 7-123; *see also* doc. # 14 at 35-38.

Petitioner concludes that "[t]here is no strategic reason, nor has counsel offered one, for failing to investigate and present the evidence that state habeas counsel presented in state habeas proceedings to Petitioner's capital sentencing jury. Petitioner was prejudiced as a result." Doc. # 14 at 56.

### F. *Jefferson* Redux

Blankenship illuminates the fact that, like the petitioner in *Jefferson*, he presented the above-enumerated, extensive mitigation evidence to

the state habeas corpus court which, he contends, made *no* § 2254(d)-respectable findings. In fact, he asserts, that court's review of this IAC claim is superficial at best and thus this Court cannot presume that its judgment is correct. Doc. # 14 at 39-40.

Here is that court's entire IAC ruling, as excerpted from its eight-page opinion:

> Petitioner was represented by two competent attorneys who hotly and ably contested the state's case at every phase of Petitioner's trials. In fact, the Petitioner seeks to have two attorneys declared ineffective notwithstanding the fact that they secured reversals of two prior sentences of death entered against Petitioner.

> The Court finds on review of the record and consideration of the evidence presented in this Habeas proceeding that Petitioner was afforded effective assistance of counsel. Petitioner seeks to hold his attorneys to a standard of perfection which is impossible to attain for any man or woman. He was entitled to and received effective assistance of counsel as mandated by the Constitution.

Doc. # 7-78 at 8 (3/6/91 Order denying relief).

That court in effect stated that "a review of the record shows no constitutional error" -- without explaining why. The State insists that, while the opinion fails to cite *Strickland*, that is not dispositive. Doc. # 15 at 23-24 (*citing Early v. Packer*, 537 U.S. 3, 8 (2002) (citation to controlling Supreme Court precedents is not required, "so long as neither the reasoning nor the result of the state-court decision contradicts them"). At the same time, however, the State makes no effort to address the conclusory

nature of this ruling, in which the state court in effect has announced that it has reviewed the record and finds no IAC because, well, there was no IAC.

Circular-logic based review, as opposed to a reasoned, principled analysis explaining *why* Blankenship did not receive ineffective assistance, can fetch no deference here. As in *Jefferson* and *Williams*, the state habeas court simply failed to *explain* the basis for its ruling. Thus, § 2254(d) does not apply. Instead, the Court employs *de novo* review, *compare Hannon*, 2007 WL 3119632 at * 19 (applying § 2254(d)(1) deference and noting that "[t]he Florida courts meticulously evaluated each of Hannon's IAC/penalty phase claims under Strickland, and the Florida Supreme Court's dispositive factual findings are fully supported by the record"), subject to *Brecht's* "harmless error" standard. *See Ferensic*, 501 F.3d at 472.

Evidently anticipating this result, Respondent invokes a fall-back position:

> [I]f this Court finds that it should conduct a *de novo* review of this ineffectiveness claim, this Court could choose to review this claim solely in light of the prejudice prong and for reasons [set forth in his brief], Respondent submits that under the totality of the circumstances, this Court should find that Petitioner cannot establish the requisite "prejudice" under *Strickland*.

Doc. # 15 at 26. The Court agrees with the Respondent; prejudice (hence, *Brecht* harmless error) must be shown in any event.

## G. "The Strategy"

At the state habeas evidentiary hearing, resentencing counsel explained that their

resentencing trial strategy "was to show that someone else was present and committed the murders and plant some sort of reasonable doubt to avoid a death sentence[.]" Doc. # 7-69 at 55; *id.* ("Yes. That there was someone else there [at the crime scene], yes"). They limited their primary focus on "blood and hair" forensics (that blood evidence did not conclusively show that Blankenship -- who is white -- raped the victim, a "negroid" hair found at the scene did not match him, and a black man had been arrested for murdering someone else[18] nearby, doc. # 7-69 at 20-21[19]):

Attorney Haas testified:

I think at that point we were, as I said before, really honing in on the blood and the hair in that part of the case. Again, I believe there was some family members that couldn't make it. Mr. Hendrix, again, had had the conversations with them. As to why they weren't there, I think he could go into more detail. Our theory mainly had to do with those hairs and that blood type and that part of it. That's really where we were coming from.

Doc. # 7-69 at 67; *see also* doc. # 22 at 62-65, printed page 498-501 (resentencing trial closing argument decrying State's lack of an in-depth investigation); doc. # 22 at 61 ("there was no bother to obtain other specimens when you find an unknown and unidentifiable piece of evidence, the hair from a black person").

Resentencing counsel conceded that they made no effort to obtain petitioner's employment, educational, or military records, and had no recollection of seeking any medical records or speaking with Blankenship's co-workers. Doc. # 7-70 at 41, 70.

The State says that Blankenship interfered with his counsel's efforts:

[I]t was problematic to obtain family witnesses and information from the family, because Petitioner told his attorneys not to involve his family. (H.T. 137). Mr. Hendrix believed that Petitioner wanted to protect his family, as at some point during the proceedings, Petitioner told Mr. Hendrix *not to write or correspond or call his family*. (H.T. 137).[20] This factor regarding the

---

[18] Counsel identified the black man as "Gary Nelson." Doc. # 16-3 at 132; *see also Nelson v. Zant,* 261 Ga. 358 (1991) (granting Nelson habeas relief); M. L. Radelet, *et al., Prisoners Released from Death Rows since 1970 Because of Doubts About Their Guilt,* 13 T.M. COOLEY L. REV. 907 (1996) ("After 12 years on death row, Nelson was released" for lack of evidence).

[19] "Again," counsel explained, "the third trial was more geared toward the idea of there possibly having been someone else there the night that this happened and the fact of this unexplained Negroid hair and the unexplained B antigen blood that was found and that sort of thing...." Doc. # 7-69 at 23; *see also* doc. # 7-70 at 4 ("Q. Is it fair to say that throughout the course of these proceedings the theory of defense focused on this Negroid hair to some extent? A. The hair, the blood sample and the fact that there was a possibility that there might have been someone else there that night, yes"); *id.* at 20-21 (the State lost that piece of hair before trial); *id.* at 60-61 ("[I]'m struck with the idea that I've always felt that there was one or more people involved in Ms. Bowen's death. And that's the point where Roy would not discuss who or what, other than at one point he finally said to me that he guessed there was someone there but I have promised not to ever say who. And of course, then we had to talk about what this means. And all I've always believed there was someone else there. And that Roy is in his own way, he is protecting someone"); *id.* at 68-69 (Blankenship was content, counsel surmised, to use the "third person" defense so long as that person was not identified); *id.* at 153-54.

[20] *See* doc. # 7-70 at 67 (Blankenship "admonished [lead counsel] not to write or correspond with or talk on the

instructions by Petitioner to his trial counsel not to contact his family, is significant for this Court's review of the state habeas corpus court's rejection of Petitioner's ineffectiveness claim. As stated, in *Fugate v. Head*, 261 F .3d 1206, 1239 n. 53 (11th Cir. 2001), "Because the reasonableness of counsel's acts (including what investigations are reasonable) depends 'critically' upon 'information supplied by the petitioner' or 'the petitioner's own statements or actions,' evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." [*Chandler v. U.S.*, 218 F.3d 1305, 1318 (11th Cir. 2000) (en banc)] (*quoting Strickland*, 466 U.S. at 691, 104 S. Ct. 2052).

Doc. # 15 at 34 (emphasis and footnote added).

This beckons examination under *Schriro*, *supra*, where, at *trial*, the defendant adamantly blocked his own lawyer from presenting mitigating evidence. *Schriro*, 127 S.Ct. at 1940-41 (defense counsel's failure to present mitigating evidence during sentencing phase of a capital murder trial did not deprive defendant of effective assistance of counsel; defendant prohibited ex-wife and mother from testifying on his behalf, defendant told trial judge that, as far as he was concerned, there was no relevant mitigating evidence, and defendant rebutted in open court counsel's claim that prior murder

---

telephone with his family"); *see also* doc. # 7-69 at 54 ("As I recall, Mr. Blankenship didn't want us to contact [his mother], I think"); # 7-70 at 47 ("But what you have to understand is that most all of these people Roy did not want involved in his case just as he directed us to not communicate with his family. He wanted to protect his family from his case").

---

offense involved elements of self-defense).[21]

In contrast, counsel Haas testified here that she and her co-counsel

> had a lot of discussions back and forth about what would be appropriate and things. I think [Blankenship] was basically relying on us to tell him what proper strategy would be. Did he try to stop us from doing things? No, he did not. We had conversations and discussions about why we would do particular things and he would *acquiesce in our judgment*.

Doc. # 16-2 at 61 (emphasis added). In light of the extensive access to Blankenship's mother prior to the last sentencing trial, and knowledge of the mental illness history that ran in his family, there is simply no support for the contention that Blankenship blocked access to what turned out to be compelling mitigating evidence (homosexual sodomy, "whipped" by mother afterwards,[22] nightmarish "stepfather

---

[21] As the *Schriro* Court explained:

> Landrigan interrupted repeatedly when counsel tried to proffer anything that could have been considered mitigating. He even refused to allow his attorney to proffer that he had worked a regular job at one point. This behavior confirms what is plain from the transcript of the colloquy: that Landrigan would have undermined the presentation of any mitigating evidence that his attorney might have uncovered."

127 S.Ct. at 1941 (cites omitted).

[22] Punishing a sex-crime *victim* may happen elsewhere, *see* http://www.foxnews.com/story/0,2933, 311848,00.html (site as of 11/15/07) ("RIYADH, Saudi Arabia -- A 19-year-old female victim of gang rape who initially was ordered to undergo 90 lashes for 'being in

episodes," including walking in on Kirk's toe-trigger suicide attempt, watching one's pet hamsters be thrown against rocks, evading perceived additional homosexual molestation, etc., and all of it presented through the prism of a mental health expert's testimony).

Note that, even when the defendant's family members and the defendant himself suggested that no mitigating evidence was available in *Rompilla*, his lawyer nevertheless was bound to go around his client and make reasonable efforts to obtain and review material that he knew the prosecution would "probably rely on as evidence of aggravation at the sentencing phase of trial." *Rompilla*, 545 U.S. at 377. In opting to blend a mitigation-defense with a residual-doubt defense here, Blankenship's counsel were similarly obligated because, having crept down the mitigation path, they counterproductively trivialized that defense by superficially investigating, then desultorily presenting it.

For that matter, *attorneys* are in charge of strategizing and litigating a case, *not* their clients:

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. *Strickland*, 466 U.S., at 688, 104 S.Ct. 2052. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois*, 484 U.S. 400, 417-418,

108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval).

*Florida v. Nixon*, 543 U.S. 175, 187 (2004); *Stenson v. Lambert,* 504 F.3d 873, 891 (9th Cir. 2007) ("In cases where the evidence of guilt is overwhelming and the attorney is attempting to avoid the death penalty, an attorney does not need to obtain the defendant's explicit consent before he concedes guilt in the sentencing phase").[23]

Here Blankenship did *not* adamantly block counsel from conducting a reasonable investigation. Petitioner at most did not *want* his family members contacted and thus told counsel not to contact them; but counsel never claimed that he blocked them, much less adamantly, as occurred in *Schriro*. Moreover, it is undisputed that Blankenship did not dissuade his lawyers from investigating

---

[23] Only the decision to waive fundamental rights is something the client can control:

> [C]ertain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

*Nixon*, 543 U.S. at 187.

---

the car of an unrelated male at the time of the rape,' has been sentenced to 200 lashes and six months in jail for telling her story to the news media") , but it most certainly would not be the norm in this country, and there can be little doubt that hearing this would evoke a sympathetic reaction from the jury.

employment, educational, military or medical records, or from speaking with Blankenship's co-workers -- all of which counsel said that they either did not investigate or could not remember investigating.[24]   Doc. # 16-2 at 110, 111, 140. And, as the State itself pointed out through state habeas court questioning, Blankenship actually did provide counsel with family background information:

> **Q.** [THE STATE] Did he ever give you the names of any witnesses for the guilt/innocence phase based upon those conversations?
>
> **A.** [ATTORNEY HAAS] Yes. We[25] had named the family members that we used.
>
> **Q.** What sort of information could they have provided or added to this case?
>
> **A.**  His family background and so forth. He was from West Virginia and came from -- I really don't recall the specifics of it now, like just that he came from sort of a hard background, and we hoped to be able to use some of that.  And certainly his mother we hoped to use as someone who could give us some insight into him, and to what had happened here, and to what kind of a person he was.

> **Q.** Was this information you thought would be helpful at the guilt/innocence phase or perhaps in mitigation at the sentencing phase?
>
> **A.**  In the mitigation phase is what we were looking for, to use her there.

Doc. # 16-2 at 52 (footnote added); *see also id.* at 54 (counsel recalls mother actually testifying at one of the trials but not the last sentencing trial); *id.* at 55 (counsel testifies that petitioner furnished her with the names of family members but recalls him providing the names of no other mitigation witnesses).

Indeed, counsel Hendrix attests that in 1982 -- four *years* before the resentencing hearing -- he

> became aware that members of [petitioner's] family had histories of psychological problems.  It was my understanding that at least three family members, including two of Mr. Blankenship's sisters,  suffered episodes of schizophrenia.  [¶] That history, as it was made known to me by Mr. Blankenship's mother, is set forth in [a] memo from me to William W. Wolfe, M.D., dated September 7, 1982 .

Doc. # 7-124 at 9; *see also* doc. # 7-125 at 17 (Nellie's affidavit: "I telephoned Roy's attorney, John Hendrix, before Roy's third sentencing trial to explain to him that Roy's sisters were paranoid schizophrenic, and in addition that my father's brother also was mentally ill, and in fact lived most of his life in a psychiatric institution. He also suffered from schizophrenia.  I further told Mr. Hendrix some of the hospitals where my girls had received treatment for their schizophrenia.  Finally, I told Mr. Hendrix to contact me if there was anything else I could do

---

[24]  Actually, lead counsel's memory loss (from testifying in a habeas proceeding, years after the resentencing trial), is limited to whether they investigated Blankenship's medical and military records, not the remainder of this list.  *See* doc. # 16-2 at 110, 111.  In that respect, the State argues that this Court should take that (counsel's memory fade) into account in crediting the state court's IAC findings.  Doc. # 15 at 30-31 (citing Hendrix's "lack of access to his file").  The state court made no findings on that score.

[25]  This appears to be a typo.  It seems more likely that Haas actually said "he," meaning Blankenship.

to help Roy. If Mr. Hendrix had asked me I would have told him the additional facts about Roy's family background and psychiatric problems as stated above. I also would have been willing to testify to a jury the aforementioned facts had I been asked").

*Wiggins* and *Rompilla* now make clear that counsel cannot *carte blanche* rely on what the client tells them when deciding how far to investigate a mitigation defense, which is typically the *only* defense in many capital sentencing trials.

In that respect, residual doubt is not even considered a mitigating factor -- so much so that there is no constitutional violation if a state substantially restricts a defendant's presentation of it at sentencing. *Oregon v. Guzek*, 546 U.S. 517, 525-26 (2006) (noting that the sentencing phase "traditionally concerns how, not whether, a defendant committed the crime," Court held that state could permissibly limit a defendant from presenting live, additional testimony from his mother about his alibi, and instead could limit him to the *transcript* of his original alibi evidence from the original trial). "By the time they reach the sentencing phase," it must be remembered, "the parties already have litigated whether the defendant committed the crime." *Stenson,* 504 F.3d at 890.

And "*Strickland,*" it must be remembered, simply "does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Wiggins,* 539 U.S. at 527. An effective lawyer cannot make a reasonable judgment to, as part of a resentencing trial strategy, employ a mitigation defense without *first* at least minimally investigating what evidence is available to support it. That simply was not done here. Counsel's failure to conduct a reasonable investigation for a mitigation

strategy that in fact was employed but only superficially presented may be said to easily match the level of ineffectiveness that justified an IAC finding in *Wiggins*.[26] And there is no "new rule" analysis to consider because this Court is applying *Wiggins* and *Rompilla*, which simply applied *Strickland*.

Nevertheless, only "highly deferential"

---

[26] The State's reliance on *Fugate* is misplaced. Sentencing counsel there contacted most if not all of the mitigation witnesses that their client provided them, then made reasoned decisions in culling them for the penalty phase of their client's capital trial. 261 F.3d at 1238-40. Further, the post-conviction "affidavit" witnesses (those who claimed that, had counsel contacted them, they would have provided mitigation evidence) at most were repetitive of what was presented at trial. *Id.* at 1240. The *Fugate* record revealed considerably more than the "hollow shell" presentation that justified federal habeas relief in *Collier,* 177 F.3d at 1202, and in *Williams,* 529 U.S. at 395.

Here, in contrast, one of the two sentencing counsel admitted that they were ultimately in control of their client, they did not investigate employment, educational, or military records, had no recollection of seeking any medical records or speaking with Blankenship's co-workers, doc. # 16-3 at 111, 140, and it is obvious that they ceded strategy-decision-making to their non-lawyer client when in fact, under *Nixon,* it was their professional obligation to do otherwise.

Under *Rutherford v. Crosby*, 385 F.3d 1300, 1315 (11th Cir. 2004) (rejecting IAC based on failure to present mitigating evidence, and distinguishing *Wiggins*, noting that the new mitigation in *Wiggins* was not counterproductive or inconsistent with the other mitigation offered, while Rutherford's mitigation "would have come with a price"), the question to be asked here is this: Would such mitigation evidence have been counterproductive and come with a price? The answer is no, as evidenced by counsel's decision to *actually present* mitigation evidence, but superficially so at best, and the fact that the State now cites no "trap-door facts" (*i.e.*, that, had trial counsel presented what habeas counsel now presents, some adverse, countervailing facts would have been introduced by the prosecution), as was the case in *Dill v. Allen,* 488 F.3d 1344, 1363 (11th Cir. 2007).

review of counsel's performance is permitted, *Jennings,* 490 F.3d 1230 at 1243, and "[t]here are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions." *Williams v. Allen,* 458 F.3d 1233, 1239 (11th Cir. 2006).

Blankenship's burden of persuasion here thus is a heavy one. He "must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. Weighing against him here is the post-*Wiggins/Rompilla* case of *Alderman v. Terry*, 468 F.3d 775 (11th Cir. 2006), where the circuit held that defense counsel, in a capital re-sentencing trial wherein they pursued a lingering or residual doubt theory as to whether the defendant murdered his wife, were simply not ineffective in their life-history investigation, or their presentation of mitigating evidence, where they made a strategic decision to forego a fuller presentation of the life-history evidence. *Id.* at 794-95. Nor did they mistakenly believe they were limited in their presentation of mitigation evidence to "character evidence." *Id.* at 795.

Other Eleventh Circuit cases also tilt habeas relief against Blankenship. *Gilliam,* 480 F.3d at 1035 (defense counsel did not perform deficiently in failing to call defendant's mother as witness, to conduct further investigation into defendant's mental health, or to investigate, as potential mitigation evidence at penalty phase of capital case, possibility that defendant was abused as child); *Callahan v. Campbell*, 427 F.3d 897, 934-35 (11th Cir. 2005) (defense counsel's performance was not "deficient," based on his failure to investigate, as potential mitigation evidence at penalty phase of capital case, possibility that defendant was abused as child, where there was no evidence that defendant ever told attorney that he was abused,

where defendant's psychiatric records, in which defendant and his mother discussed his youth in great detail, contained no reference to any abuse, and where information that attorney had in his possession, regarding defendant's previously strained relationship with his father and his father's drinking, was not itself indication of any physical abuse).

Indeed, even structural-error level showings may not suffice. *Purvis v. Crosby*, 451 F.3d 734, 740 (11th Cir. 2006) (prejudice may not be presumed but must be shown in order to establish IAC based on the failure to raise a claim of structural error at trial); *Lowery v. Cummings*, 2007 WL 3357721 at * 10 (11th Cir. 11/14/07) (unpublished) ("We have recognized that, with three exceptions not applicable in the instant case, prejudice is not presumed but must be shown in order to establish ineffective assistance of counsel based on failure to challenge structural error").

These cases show that there is a virtually impenetrable "residual-doubt *strategy*" standard applied in this circuit. Hence, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.1994); *Trotter v. Secretary, Department of Corrections*, 2007 WL 3326672 at * 5 (M.D.Fla. 11/6/07) (unpublished).

Overarching all of that is the fact that the crime giving birth to this case occurred on 3/2/78. Thus, it has been almost thirty years since a 78-year-old female, at home alone, unable to sleep and sitting in her chair, was raped and murdered by Roy Willard Blankenship, an intruder. The jury could easily find that she struggled in vain and was severely beaten, and suffered horribly by the unspeakable and sadistic infliction of a foreign

object into her sexual organs.

In the meantime, the courts have plowed every furrow, re-tilled the record, and thrice tried him, resulting in a *multi-decade* delay in his execution. As in all cases of this type, petitioner's attorneys are attacked and tried for their alleged professional incompetence. And, the *de rigueur* but *Daubert*-dubious "mitigation expert" is rolled out for the customary "could-have-would-have" hindsight.

Except for the restraints placed by Congress, federal courts have been compliant with the resulting, abysmal delays in these cases. The obvious objective of those who conscientiously oppose the death penalty is to create delay and render litigation costs so burdensome money- and manpower-wise that capital punishment will simply be abandoned by prosecutors.

This nullification of law by resource exhaustion has succeeded in great measure. Mitigation evidence has now assumed a paramount role in sentencing. Is there any defendant who does not eventually claim victimization as a child by one or more parents, siblings, or relatives? One may rightly ask, when did that become a license to kill? Does it replace the McNaughton-Rule-derived[27] notions of volition-neutralizing incompetency?

Nothing in the arduous examination of this

record would lead any fairminded person to believe that Blankenship was so lacking in mental capacity that he did not know the difference between right and wrong. He was employed, and, according to him, his employer and co-workers would testify that he was diligent and performed his work well. This belied his claimed inability to appreciate the sheer horror that he perpetrated upon a defenseless elderly woman.

Adding irony to all of this is his current claim that the approximate three decades that have elapsed since the murder -- the very delay that *he* created through repeated appeals -- amounts to "cruel and unusual punishment." *See infra* Part II(Q)(1).

Delay from what? He has had a life enabled by the lenient policy of according him due process long after all of the essential issues have been resolved by jurors, trial judges, and the Supreme Court of Georgia. This claim bespeaks the classic example of "chutzbah": A defendant convicted for murdering his parents who seeks mercy because he is an orphan.

The Court denies Blankenship's IAC claims on all of these grounds. In light of this result, it is not necessary to reach the IAC-prejudice issue. *Salter v. McDonough*, 2007 WL 2455339 at * 2 (11th Cir. 8/29/07) (unpublished) ("Although the *Strickland* test consists of two components, their application is not sequential, and we need not consider both components if the petitioner makes an insufficient showing as to one component").

## H. *Brady* Claim

Blankenship's *Brady* claim is somewhat complex. It is undisputed that

(a) two weeks before the victim was

---

[27] The rule stems from the 1843 Trial of Daniel McNaughton, who shot and murdered Edward Drummond, the Private Secretary to the then British Prime Minister, Sir Robert Peel. McNaughton believed that the Prime Minister was conspiring against him. The court acquitted him "by reason of insanity," and he lived in a mental institution for the rest of his life. However, the case caused a public uproar, and Queen Victoria ordered the court to develop a stricter test for insanity. http://www.forensic-psych.com/articles/artMcNaughton Rule.php (site as of 12/13/07).

murdered in this case, there had been another murder nearby, for which the State pursued Gary Nelson, *see supra* n. 18; and

(b) "*Brady* misconduct" by the prosecution led the state supreme court to vacate Nelson's conviction, which ultimately led to his release from prison. Doc. # 14 at 58-68; *supra* n. 18.

On direct appeal from his latest resentencing trial, Blankenship litigated his *Brady* claim in this manner:

Blankenship complains that notwithstanding his previous requests for exculpatory information under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was not informed that the autopsist had expressed an opinion that this case appeared to be similar to a case involving Gary Nelson, *see Nelson v. State*, 247 Ga. 172, 274 S.E.2d 317 (1981), and that a detective's notes of the autopsy referred to the autopsist's observations. Noting that he has long contended that another person was present in the victim's apartment, Blankenship contends the state's delay in providing exculpatory information about the autopsist's observations requires the reversal of his death sentence. We disagree.

The defendant testified at this sentencing trial that he knew Gary Nelson and that Gary Nelson was not the person in the victim's apartment. In these circumstances, the mere fact that the autopsist noticed some similarities between the two cases could not be exculpatory of Blankenship's guilt. *See Castell v. State*, 250 Ga. 776, 782, 301

S.E.2d 234 (1983). Moreover, his claim for relief relates only to the sentence, and he learned of this evidence prior to the re-sentencing trial. Inasmuch as it was available to him prior to trial, it could not have been "suppressed." Blankenship has failed to show that the disclosure came so late as to deny him a fair trial.

*Blankenship* 258 Ga. at 44 (cite omitted).

But, Blankenship now contends, things happened after that trial, and after that appeal. However, from page 62-69 of his petition here, he raises a multitude of factual assertions (*e.g.*, "Moreover, after the defense approached [state microanalyst Roger] Parian with questions about the seven Negroid hairs found on the victim's body, he changed his story," doc. # 14 at 62), which are simply *not* followed by citation to the record. *See also id.* at 64-66 (over two pages of "state misconduct" assertions unsupported by any citation to the record). These assertions support the core of his *Brady* claim. The same may be said for his "apartment search" *Brady* claim found in n. 17, doc. # 14 at 58. Yet, this Court long ago *ordered* both parties to supply such citations:

Both sides are thus reminded that they must strictly comply with S.D.Loc.R. 7.1(b), which requires that [¶] *[e]very* factual assertion in a motion, response, or brief *shall* be supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence filed with the motion.

*Id.* (emphasis added).

Doc. # 8 at 5. This is the *second* time that current counsel have failed to comply with this Court's directions. *See* doc. # 13 at 2. Worse, it is clear that they simply "recycled" this

portion of their brief from their brief before the Georgia Supreme Court. *See, e.g.*, doc. # 14 at 66 ("Ultimately this Court reversed Mr. Nelson's conviction and death sentence....") (citing *Nelson v. Zant*, 261 Ga. 358 (1991)). *This* Court therefore deems Blankenship's *Brady* claims abandoned.

## I. "Sodomy Claim"

Blankenship next complains of resentencing court error:

> Petitioner was indicted for murder, rape, burglary and aggravated sodomy in 1978. After hearing the evidence, the jury at Petitioner's first trial found petitioner guilty of felony murder, rape and burglary. The jury found Petitioner not guilty of aggravated sodomy or the lesser offense of sodomy. At the 1986 resentencing trial, over objection of counsel, the state introduced evidence that Petitioner committed sodomy, even though he had previously been acquitted of this charge.

Doc. # 14 at 73 (emphasis added). "Among the testimony and evidence improperly admitted at the sentencing," says petitioner, "was testimony by pathologist Roderick Guerry who testified on direct examination by the state that the victim had been raped orally." *Id.* at 73-74 (quotes and cite omitted). Blankenship then recounts other, damaging "sodomy" evidence. *Id.* (state crime lab forensic serologist Linda Tillman, who testified that sperm as found on an anal swab was consistent with anal intercourse; and part of petitioner's statement to the police, recounted *supra* n. 17, which could indicate that sodomy occurred). Because he was sentenced to death for "acquitted conduct," petitioner concludes, this violates his various federal constitutional rights. *Id.* at 74-75.

The State argues that the Tillman and Guerry portion of this claim is unexhausted,[28] doc. # 15

---

[28] The portion concerning Blankenship's statement to the police was presented on direct appeal:

> Blankenship contends that his pre-trial statement to law enforcement officers should not have been admitted in its entirety because it contained a reference to sodomy, an offense for which he was acquitted. Compare Fugitt v. State, 256 Ga. 292(1d), 348 S.E.2d 451 (1986).

> The only possible reference to sodomy occurred in the following portion of his statement: "When I put her on the bed and took her clothes off I was drunk I guess. I said I may as well go ahead and get some pleasure. That's when I had the relationship with her. As far as I know I thought I [had entered her vagina]."

> Rape was one of the statutory aggravating circumstances in the case. *See* OCGA § 17-10-30(b)(2). Blankenship's statement was an admission that he raped the victim and a denial that he committed sodomy. Nothing in the statement was offered to prove the commission of a crime for which the defendant had been acquitted (as he contends), and the trial court did not err by admitting the entire statement in evidence.

*Blankenship*, 258 Ga. at 45. This was renewed before the state habeas court. Doc. # 7-68 at 10-11. Thus, to the extent petitioner complains of his statement being used against him at trial, this claim is exhausted. Nevertheless, the Court does not find the state court's disposition of it unreasonable within the meaning of 28 U.S.C. § 2254(d)(1), much less erroneous under a *de novo* review. It was permissible to show rape as an aggravating factor; an admission that Blankenship thought he *just* raped the victim, which is essentially what he allegedly said, *see* doc. # 7-49 at 33, printed page 474 ("As far as I know I thought I was in the right hole"), cannot in any reasonable sense be deemed to have deprived him of a fundamentally

at 68, and thus procedurally defaulted under O.C.G.A. § 9-14-51. Blankenship does not show, the State contends, how he was prevented from raising such claim components before the state courts, and there is no reason to believe that, were this claim sent back to the state courts for exhaustion, they would not bar it under O.C.G.A. § 9-14-51.

Blankenship says he *did* raise such claims before the state habeas court. Doc. # 12 at 3-4. That's only partially correct, however. Before the state habeas court he only indirectly challenged Tillman's *qualifications* as an expert witness. *Id.*; *see also* doc. # 7-68 at 38 (decrying defense counsel's failure to challenge her qualifications). He refers this Court to no other record cite showing that he exhausted his new spin on the "Tillman" claim. Under the legal standards set forth *supra* n. 8-9, this claim is defaulted, and on futility grounds the Court denies his request to in effect "re-percolate" this claim through the state-federal court systems.[29]

---

fair trial merely because one could infer the converse of that statement (and if he didn't then yes, he must have penetrated the wrong orifice, which thus would constitute accidental sodomy).

[29] Blankenship hedges:

> Mr. Blankenship requests that if the Court finds that any of Mr. Blankenship's claims appear not to have been exhausted, the Court grant leave to amend the Petition. Alternatively, should this Court decline to permit Mr. Blankenship leave to amend, Mr. Blankenship requests that he be given adequate notice of any decision made by this Court concerning a lack of exhaustion and an adequate opportunity to respond so as to enable Mr. Blankenship to drop claims from the federal habeas petition should he elect to do so.

But petitioner is correct regarding Dr. Guerry. *See* doc. # 7-67 at 6-7. Thus, the state court in fact was given an opportunity to consider the admissibility of Guerry's testimony, and Blankenship therefore has satisfied the exhaustion requirement on that score. The State, in that respect, offers no response *on the merits* here. However, under *Forensic,* 501 F.3d at 472 (apply *Brecht's* harmless-error analysis), the Court must deny this claim on the merits because it is virtually inconceivable that, given the overwhelming evidence -- including Blankenship's own testimony that he was *at the crime scene*, his wishy-washy answer that it was only "partially" true that he penetrated the victim, that fact that (a rational jury would be authorized to conclude) he lied to the police about statements he gave them, including whether someone else was at the scene, and that he did so for a reason but could not say because he made a "vow" to "God," *see* doc. # 7-49 at 36-37, printed pages 478-79, *id.* at 38-89, printed pages 480-81 -- the outcome here would have been any different had this error, assuming it is one, not occurred.

### J. Photographs Claim

This rather generic claim -- that the resentencing court erred by allowing the admission of gruesome photographs of the victim when her identity was undisputed, so the whole point was to simply (and unfairly) inflame the jury into voting execution, doc. # 14 at 76-77 -- is, argues the State, not something this Court can rule upon because (a) it was resolved by the state supreme court on direct appeal; (b) that ruling rests on state law; (c) AEDPA commands this Court's deference on

---

Doc. # 12 at 2 n. 2. The Court declines this "hedge" request. Finality concerns dictate against "sampling the waters" and then withdrawing one's toe once the water is found too hot.

that score; and (d) even if not, Blankenship has failed to show that the state court's ruling is "contrary to," or an "unreasonable application of clearly established" U.S. Supreme Court precedent.

The State is correct. The prosecution here was obligated to prove that the murder was committed in violation of O.C.G.A. § 17-10-30(b)(7) ("The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim"); *Drake v. Francis*, 727 F.2d 990, 999 (11th Cir. 1984).

The photographs therefore were relevant. *See U.S. v. Brown*, 441 F.3d 1330, 1362 (11th Cir. 2006) (photographs of the homicide victim were relevant at the penalty phase of the trial in determining whether the "heinous, cruel, or depraved" aggravating circumstance existed); *see also McGahee v. Campbell*, 2007 WL 3037451 at * 20 (S.D.Ala. 10/15/07) (unpublished). And, they were not excludable merely because the defendant has stipulated to the cause of death. *Ford,* 488 F.Supp.2d at 1327.

As was the case in *Grossman v. Crosby,* 359 F.Supp.2d 1233 (M.D.Fla. 2005), petitioner "has not cited a United States Supreme Court case that even reached the issue he raises," *id.* at 1277, so it cannot be shown that the Georgia courts engaged in an unreasonable application of federal constitutional law. This claim, then, also must be denied.

## K. Underrepresentation Claim

Blankenship pretrial-challenged the array of the grand jury that indicted him in 1978, and sought information to prove the alleged improper and unconstitutional composition of the grand jury that indicted him. Doc. # 14 at 78. Now contending that he was indicted by an unconstitutionally constituted grand jury (it was underrepesented by women and blacks), petitioner also complains that the culpability phase trial court violated state law by failing to certify the grand jury to ensure the constitutional minimum. *Id.* at 80-81.

The state law portion of this claim is untimely, *see Blankenship*, 258 Ga. at 44-45, and the federal portion of this claim, premised on *Vasquez v. Hillery*, 474 U.S. 254 (1986), fails because Blankenship did not timely object in his case, while Booker T. Hillery did. *Id.* at 256 ("Before trial in Superior Court, respondent moved to quash the indictment on the ground that it had been issued by a grand jury from which blacks had been systematically excluded"). Procedural default therefore applies here. *Cervantes Salazar v. Dretke,* 393 F.Supp.2d 451, 472-73 (W.D.Tex. 2005).

Blankenship argues cause and prejudice (necessary to surmount procedural default, *see supra* n. 9) because his counsel were ineffective by failing to timely challenge the array. Doc. # 12 at 13; *see also* doc. # 7-65 at 20, ¶ 48 ("Defense counsel failed to timely challenge the composition pool from which the 1978 grand jury which indicted petitioner was drawn, when counsel knew, or reasonably should have known that challenges to other grand jury pools in that area at about that time period had disclosed that there was a substantial under representation of blacks and women in grand jury pools as compared with numbers of blacks and women in the community"); # 7-81 at 18-19; *Cervantes Salazar,* 393 F.Supp.2d at 474 (habeas petitioner challenging state court conviction of capital murder on grounds of improper grand jury composition was not entitled to "cause and actual prejudice" exception to procedural default doctrine; none

of petitioner's IAC assertions focused on failure of trial counsel to file pretrial motion to quash indictment, or on failure of appellate counsel to challenge composition of grand jury on direct appeal).

Inexplicably, the State does not respond at all to this, a claim that is *not* frivolous. *See, e.g.*, *Ringo v. Roper*, 472 F.3d 1001, 1008-09 (8th Cir. 2007) (denial of capital murder defendant's discovery request for racial and gender composition of grand jury that indicted him did not preclude defendant from claiming that grand jury pool did not reflect a fair cross-section of community, as required by equal protection clause of fourteenth amendment; evidence sought did not address the makeup of grand juries over an extended period of time and therefore could not raise inference of systematic exclusion of a class of persons in jury pool); *Valle v. Secretary for Dept. of Corrections,* 459 F.3d 1206, 1215-16 (11th Cir. 2006) (governing standards for this claim); *Sosa v. Dretke,* 133 Fed.Appx. 114, 126 (5th Cir. 2005). At the same time, Blankenship does not seek discovery on this claim. Doc. ## 17, 21.

Under *Brecht*, as construed by *Ferensic,* 501 F.3d at 472 and *Hodges*, 2007 WL 3307014 at * 5, the Court nevertheless denies this claim because even

> if trial counsel had moved to quash the indictment on the ground that the grand jury returning the indictment did not represent a fair cross-section of the community, and had persuaded the state trial judge to dismiss the indictment on that basis, there is no doubt that the state would have sought and obtained a second indictment on the same charge.

*Hudson v. Cain*, 2007 WL 2228598 at * 9

(E.D.La. 7/30/07) (unpublished). There is no question here that the evidence was overwhelming, including Blankenship's own testimonial admission that he was *in the victim's* room when the rape/murder took place.

## L. Prosecutorial Misconduct

Petitioner next claims that at both his culpability and sentencing trials the prosecutor repeatedly made impermissible comments and arguments which, individually and cumulatively, violated his constitutional rights. Had such comments not been made, he contends, the outcome of the trial would have been different. Doc. # 14 at 82-89.

Arguing procedural default, the State first points out that Blankenship failed to challenge such comments on his culpability-phase direct appeal, *Blankenship v. State*, 247 Ga. 590, nor on his resentencing direct appeal, *Blankenship*, 258 Ga. 43. Doc. # 15 at 79-80.

Once again, petitioner claims he can show cause and prejudice to overcome procedural default, doc. # 12 at 14, and once again the State, despite this Court's liberal reply brief policy, has declined to respond.

However, it is not enough to simply say, as Blankenship does here, that "[p]etitioner can show cause and prejudice to excuse default and entitl[e] review on the merits," doc. # 12 at 11, then simply refer this Court to another document buried in a 2-foot thick record. Indeed, this Court *repeatedly directed* Blankenship's counsel to *fully brief*, with record cites, any and all issues and defenses. Doc. # 13 at 1. Deep in the record Blankenship unearths this argument, made before the state supreme court on state habeas appeal:

> Defense counsel unreasonably failed to

object to the prosecutor's improper comments during Petitioner's trial, including the prosecutor's closing argument at Petitioner's guilt/innocence trial in which he commented on Petitioner's invocation of his constitutional right to silence. The prosecutor stated that "the only two people that know what went on in that room that morning, one won't tell you and the other one can't tell you." T-1 562. This reference to Petitioner's failure to explain the events in question led the jury to believe that Petitioner had a burden to provide an explanation, and that Petitioner's failure to do so could be held against him. The statement impermissibly shifted the burden of proof, violating Petitioner's right to a fair trial. *See, e.g.*, *Doyle v. Ohio*, 426 U.S. 610, 619 (1976).

Doc. # 7-81 at 22-23.

Assuming Blankenship has shown cause, he does not show prejudice in that the culpability phase evidence was overwhelming and no one can reasonably say that, had this claimed error not occurred it is reasonably likely that it would have altered the culpability phase's result. *See Ferensic,* 501 F.3d at 472.

The Court is shown no other cause and prejudice with respect to the remainder of Blankenship's "prosecutorial misconduct" arguments, except that, to hedge his bets, Blankenship cites a "blank check" clause that he inserted into his state habeas appellate brief:

All other arguments in this Petition are incorporated into this argument by specific reference. In addition, Petitioner claims as error trial and appellate counsel's failure to raise any issue which the court below, or this Court on direct appeal, refused to consider on the merits for lack of a timely objection. Likewise, with respect to all of the allegations in this Argument that counsel ineffectively failed to raise objections to unconstitutional occurrences at Petitioner's trial, Petitioner also asserts those unconstitutional occurrences as separate errors meriting relief.

Doc. 7-81 at 18 n. 20.

Of course, habeas litigation doesn't work that way, especially *capital* habeas cases, where one must timely argue and stand on their rights rather than ask others to search the record and assert their rights for them -- precisely what this "footnote-argument" impliedly asks the Court to do. This "residuary-clause" footnote thus accomplishes nothing here, as it most certainly does not *explain* how cause and prejudice (*i.e.*, attorney error of such magnitude that it overcomes the procedural default doctrine) salvages the balance of petitioner's prosecutorial misconduct arguments.

Meanwhile, even though Blankenship claims that he can show cause and prejudice for various claims, doc. # 12 at 13-14 ("impermissibly defined mitigation argument" claim) he never gets around to doing it. *Id.* (claiming he can show cause and prejudice but citing to *nothing*). Announcing an intent to do something, but then failing to do it, fetches no relief. This claim therefore is denied.

## M. Improper Jury Instructions -- Culpability Phase

### 1. *"Reasonable Doubt"*

Blankenship next raises several challenges to the culpability phase jury instructions. Doc. # 14 at 90-98. The State again raises procedural

bars -- lack of exhaustion and procedural default. Doc # 15 at 80-84. Petitioner's first challenge is to the culpability phase court's "reasonable doubt" instruction, which was:

> if after considering all the facts and circumstance of the cases your minds are wavering, unsettled and unsatisfied, then that is the doubt of the law and you should find the defendant not guilty. But if that doubt does not arise or exist in your minds as to the guilt of the defendant, then you should convict him.

Doc. # 14 at 90. But Blankenship has omitted mention of the immediately preceding paragraph in the culpability court's instructions:

> The burden is upon the state to prove that the defendant killed Mrs. Bowen and to do so beyond a reasonable doubt. As I stated, a reasonable doubt being one that grows out of the evidence or a lack of the evidence and where it is based upon circumstantial evidence, one step further, that is to the exclusion of every other possibility, except that the defendant was responsible. The burden is not upon the defendant to establish his innocence. The burden is upon the state to prove his guilt, and if at the end of your investigation your minds are hazy, wavering, vague and uncertain, it is your duty to give that benefit to the defendant.

Doc. # 7-12 at 57.

Assuming that Blankenship has demonstrated cause and prejudice, this claim nevertheless is without merit. *See Felker v. Turpin*, 83 F.3d 1303, 1308 & n. 5 (11th Cir. 1986); *Johnson v. Kemp*, 759 F.2d 1503, 1508 (11th Cir. 1985) (instruction using "reasonable doubt" throughout, but also stating that jury should acquit if their minds were "wavering, unsettled or unsatisfied" was not constitutionally infirm), cited in *Baxter v. Thomas*, 45 F.3d 1501, 1508-09 n. 17 (11th Cir. 1995).

### 2. *Burden-Shifting on "Intent"*

#### (a) <u>Alcohol</u>

Petitioner next quarrels with the culpability court's jury charge on alcohol's effects; he says it impermissibly shifts the burden upon him regarding the intent that the State must otherwise prove, and this violates *Francis v. Franklin*, 471 U.S. 307 (1985). The trial court instructed the jury

> that voluntary intoxication by use of alcohol or drugs is no excuse for crime. The fact that one accused of a crime was under the influence of alcohol or drugs at the time of the alleged time may be shown as illustrative of his motive in the transaction but one voluntarily under the influence of alcohol or drugs is presumed to intend the legitimate consequences of his act and the question is whether he intended to do the act or whether he intended the consequences of the act. If a person under the influence of alcohol or drugs is sufficiently intelligent to know or understand and intend to do a certain act and to understand that certain consequences are likely to result from it and does the act, he is criminally liable for the consequences of his act.

> However, if because of the influence of alcohol or drugs one's mind becomes so impaired as to render him incapable of forming an intent to do the act charged, or to understand that a certain consequence would likely result from it, he would not

be criminally responsible for the act.

Whether or not that is true is a question for you, the jury, to determine.

Doc. # 7-12 at 44.

Mandatory presumptions violate the Due Process Clause if they relieve the State of its burden of persuasion on an element of the offense. *Francis,* 471 U.S. at 314. So, a "permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts." *Id.*

The *Francis* Court concluded that the challenged jury instruction there created a mandatory presumption, and that it was therefore unconstitutional. *Id.* at 316-18 (jury instructions in murder trial, which advised jury that acts of a person of sound mind and discretion are presumed to be product of person's will and that a person is presumed to intend the natural and probable consequences of his acts, created a mandatory presumption which unconstitutionally shifted to defendant the burden of persuasion on element of intent once the state had proven the predicate facts, and the fact that the jury was informed that the presumption "may be rebutted" did not cure the charge's infirmity); *see also Ward v. Runnels*, 2007 WL 1576359 at * 6 (E.D.Cal. 5/31/07) (unpublished).

An encyclopedic source neatly summarizes the dividing line in these cases:

Where an instruction to the jury relating to a presumption may be interpreted as conclusive or as shifting the burden of proof or persuasion, such interpretation violates due process. However, where the instruction is not of a mandatory nature but rather has a permissive effect or it does not operate to shift the burden of proof to the defendant, there is no denial of due process, especially where the charge is qualified to avoid the possibility that the jury might have misunderstood it as establishing a conclusive presumption of intent or as shifting to the defendant the burden of proof.

16C C.J.S. *CONSTITUTIONAL LAW* § 1650 (Nov. 2007) (footnotes omitted).

This Court finds that, with respect to the above "voluntary intoxication" charge, the state supreme court's application of federal law is not unreasonable:

This charge ... merely illustrates that the defendant has the burden, once criminal intent *has been shown*, of illustrating that his voluntary intoxication rose to a level required to negate intent. By its very terms, it is not a mandatory presumption and it is readily apparent that no reasonable jury would have viewed the instructions as mandatory or conclusive, nor would they have understood them as shifting the burden of persuasion to the accused as to a necessary element of the crime.

*Blankenship*, 247 Ga. at 592-93 (emphasis added). The Court therefore denies this claim.

### (b) Implied Malice

Petitioner next challenges the italicized portion of this culpability-phase charge:

This, in our law, is known as malice murder. That is murder committed with malice. I charge you that a person

commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention, unlawfully, to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Implied malice may exist and there may be no evidence of express malice. But it may be implied. *Implied malice, says the law, is where no considerable provocation appears and where all of the circumstances of the killing show an abandoned and malignant heart. An abandoned and malignant heart in the sense of the law is commonly held to be evinced by a weapon likely to produce death and by a brutal and bloodthirsty use of the same.*

Doc. # 7-12 at 51; # 14 at 92-93.

He first contends that the phrase "Implied malice, says the law...." sets up a mandatory presumption that unconstitutionally lifted the prosecution's burden of proving guilt. Doc. # 14 at 93 (citing *Sandstrom v. Montana*, 442 U.S. 510, 523-24 (1979)). This Court disagrees. The instruction allowed, but did not require, the jury to find implied malice *after* finding that Blankenship raped and killed the victim with a conscious disregard for human life. This type of permissive instruction did not violate due process. *Perez v. Gomez*, 132 F.3d 40, 1997 WL 786236 at * 1 (9th Cir. 12/18/97) (unpublished); *see also Rodriguez v. Russo,* 495 F.Supp.2d 158, 173 (D.Mass. 2007). This claim also is denied.

### (c) **Abandoned Heart**

Blankenship next contends that the "second part of the instruction, describing 'abandoned and malignant heart' as the use of a deadly weapon, similarly sets up a mandatory presumption in violation of *Sandstrom.*" Doc # 14 at 93. The same reasoning as above applies here, and in any event the savagery of Blankenship's attack on the victim sends this claim down the same road as its counterpart in *Gilbert v. Moore*, 134 F.3d 642, 647-48 (4th Cir. 1998) (instruction, in state capital murder prosecution, which impermissibly shifted burden on element of malice to defendants in violation of due process clause, had no substantial or injurious effect on verdicts, and thus did not warrant habeas relief, in light of overpowering evidence of malice, including number of stab wounds inflicted on victim and brutality with which wounds were delivered). This claim, too, is denied.

### 3. *The "Rape Instruction"*

Blankenship next complains that the culpabilty-phase court failed to properly instruct on the "rape" charge because it instructed the jury that penetration while the female is unconscious constitutes no consent. This fails, he contends, to advise the jury that they must find her to be alive because penetration of a deceased female is *not* rape. Doc. # 14 at 97.

This claim is without merit. The Court will set aside procedural default considerations, doc. # 12 at 3-4; # 15 at 83-84, and technical statutory arguments (*see* 75 C.J.S. *Rape* § 14 (Dec. 2007); *Thompson v. Nagle*, 118 F.3d 1442, 1147-49 (11th Cir. 1997) (Alabama rape statute requires evidence that victim was alive at the time of intercourse)) because petitioner cites not one U.S. Supreme Court case to show that the Georgia courts have unreasonably applied *federal* law in upholding the culpability verdict.

For that matter, Georgia law does not require the victim to be alive at the moment of

penetration. *See, e.g.*, *Lipham v. State,* 257 Ga. 808, 809-810 (1988) (victim does not have to be alive at moment of penetration in order for defendant to commit rape, where defendant has used deadly force to overcome victim's will), cited in *Griffin v. State*, 282 Ga. 215, 219-20 (2007) (kidnapping with bodily injury did not require proof that murder victim's bodily injury occurred before she died). Therefore Blankenship's claim -- that the trial court failed to "unambiguously instruct the jury that the victim had to be alive at the time of the sexual contact," doc. # 14 at 98 -- is without merit.

### N. Improper Jury Instructions -- Sentencing Phase

#### 1. *"Mitigation" Instructions*

Here is the resentencing court's entire jury charge on the definition of "mitigation":

> Mitigating circumstances are those which do not constitute justification or excuse for the offense of murder but which you the jury find in fairness and mercy may be considered as extenuating or reduce [sic] the decree - the degree of moral culpability so as to justify a sentence of death.

Doc. # 22-3 at 67-68. Blankenship argues that this definition was constitutionally insufficient because the court evidently said "sentence of death" instead of "life." Doc. # 14 at 100. And nowhere else in the charge, petitioner further argues, "was there any further explication of the nature of mitigation." *Id.* Nor did the court provide clarifying examples of mitigation. *Id.*

Procedural default considerations aside, doc. # 15 at 84-91; *see also* doc. # 7-81 at 21-22 (before the state courts Blankenship raised IAC claims over his counsel's failure to object), and

reading the charge as a whole, *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) (challenged jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge"), this claim fails on the merits. There is no misuse of the word "death" above. Though a tad inelegant perhaps, the trial court simply meant that the jury could find that circumstances may exist which would reduce the degree of moral culpability that would otherwise justify sentencing Blankenship to death. Too, the charge was immediately followed by the court's "aggravation" charge:

> Aggravating circumstances are those which increase the guilt or enormity of the offense are circumstances which does not justify an automatic imposition of the penalty of death by electrocution.

Doc. # 22-3 at 68. That was succeeded by this charge:

> *Regardless* of the presence or absence of aggravating circumstances the jury has both the *right and the authority* to recommend mercy which would require that the defendant be sentenced to life imprisonment.

*Id.* (emphasis added). And later on in the charge, the court instructed

> that even if you find beyond a reasonable doubt that the state has proven the existence of one or more or all of the statutory aggravating circumstances given to you in this charge, you are nonetheless not required to recommend that the accused be put to death. You shall consider the mitigating circumstances presented by the evidence if any. You may if you see fit and this is a matter entirely in your discretion - within your

discretion, [sic] provide for a life sentence for the accused because of *any* mitigating circumstances presented by the evidence. You also may recommend mercy, that is, a life sentence for *any* reason satisfactory to you or for *no* reason whether or *not* you find the existence of mitigating circumstances from the evidence presented to you in this case.

In other words, members of the jury, whether or not you recommend death or a life sentence is entirely up to you. As I stated in order to recommend the death penalty you must find one or more of the aggravating circumstance. And even though you find aggravating circumstances you may *still* recommend mercy if you see fit to do so.

*Id*. at 74 (emphasis added).

Taken as a whole, these instructions, at a minimum, meet constitutional muster. Mitigation is a sufficiently straightforward term, and here the jury undoubtedly was able to "get" the fact that evidence about Blankenship's life difficulties was an attempt to show mitigation. It does not ask too much of the jury to grasp the concept that mitigation means a reason not to choose death, while aggravation means the contrary.

The Court thus agrees with an encyclopedist's conclusion that courts "need not define the terms 'aggravation' and 'mitigation' in instructing the jury to weigh aggravating and mitigating factors in the penalty phase of a capital murder trial." 40A AM.JUR.2D HOMICIDE § 551 (*Aggravating and mitigating factors*) (Jul. 2007) (footnotes omitted). In this context it is the *limitation* on mitigation evidence that matters, *see* 21A AM.JUR.2D CRIMINAL LAW § 968 (*Mitigating*

*circumstances*) (Jul. 2007), not the failure to provide examples of it. Finally, petitioner fails to cite controlling U.S. Supreme Court precedent unreasonably ignored or applied by the State courts. This claim therefore is also denied.

### 2. *"Aggravation" Instructions*

Blankenship raises a raft of errors concerning the resentencing court's jury charge on aggravating circumstances. Doc. # 14 at 103-113.[30] The State once again invokes procedural

---

[30] More specifically, he complains that

[T]he trial court's charge failed to provide the jury with any guidance as to the construction and application of O.C.G.A. § 17-10-30(b)(7), the aggravating circumstance that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim ." *See Godfrey v. Georgia*, 446 U.S. 420 (1980); *Maynard v. Cartwright*, 108 S.Ct. 1853 (1988). [That is,] the jury was not given sufficient guidance concerning the application of the terms of section (b)(7) to this case. As a result, the jury returned a verdict which made no specific findings of fact, but merely repeated portions of the language of the statute.

Doc. # 14 at 103. He also complains that

the trial court's (b)(7) instruction in Petitioner's case -- and the jury's verdict -- included the element of "aggravated battery to the victim," although there were no facts presented at trial to show serious disfigurement or otherwise support a charge or finding of aggravated battery. *See* Res. Ex. No. 26, at 513-14. The trial court's charge was unsupported by the evidence, but was used by the jury as

---

one of the aggravating circumstances upon which their sentence of death was based. Thus, Petitioner's death sentence violated the dictates of *Gregg*, *Godfrey*, and their progeny,

*Id.* at 103-04. Next, he argues that

[o]n the whole, the trial court's jury instructions failed to define aggravating circumstances in a manner that constitutionally narrows the class of persons eligible for the death penalty.

*Id.* at 104. In addition,

various aspects of the court's oral and written instructions at Petitioner's sentencing trial unduly emphasized to the jury aggravating circumstances and d e - e m p h a s i z e d  m i t i g a t i n g circumstances. This violated Petitioner's Eighth and Fourteenth Amendment rights and unduly restricted the jury's consideration of mitigation in their penalty phase deliberations.

*Id.* He then cites examples. *Id.* at 104-05. He also contends that

[t]he trial court erroneously failed to adequately instruct the jury of the prosecutor's burden to prove the alleged aggravating factors beyond a reasonable doubt.

*Id.* at 106. He argues that trial court instructions led the jury to believe that they were required to find the (b)(7) aggravating circumstance beyond a reasonable doubt but that no such standard of proof pertained to the rape aggravating circumstance. *Id.* Lastly, he contends,

the trial court failed to adequately instruct the jury on the aggravating circumstance that the murder was committed while the defendant was engaged in the rape of the victim.

default, doc. # 15 at 86-88, as applied by the state habeas court. Doc. # 7-78 at 3, 5-6.

Both that court and the State here, however, have blithely ignored the dead rat at the bottom of the woodpile: petitioners like Blankenship may show cause and prejudice to excuse procedural default. One may do so by showing that trial counsel were ineffective. That is, had counsel been effective, they would have timely raised the very objections the absence of which the State now relies upon to invoke procedural default. This showing is not easy to make:

Generally, an attorney's failure to object does not qualify as "cause" under the cause and prejudice test. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2566-67, 115 L.Ed.2d 640 (1991). Failure to object qualifies as "cause" only if the failure to object amounts to the ineffective assistance of counsel. *Id.* at 2567. Furthermore, to prove "actual prejudice," petitioner must prove that but for the error, he might not have been convicted.

*Sixta v. Quarterman*, 2007 WL 3270394 at * 3 (S.D.Tex. 11/2/07) (unpublished) (quotes and cites omitted). So, courts essentially assume the error in fact was an error and ask if the outcome (the conviction or death sentence) would have been different (acquittal or non-death sentence) but for the error.

But the overarching point here, however, is

---

*Id.* at 107.

This last ("rape instruction") point, incidentally, is denied on the merits given the discussion in Part II(N)(3), *supra*, on Georgia rape law (*i.e.*, where the defendant has caused a rape victim's death, the State need not show temporal precision regarding his rape of her).

that the option (of overcoming procedural default by showing IAC-based cause and prejudice) exists. *See also Rodriguez*, 495 F.Supp.2d at 172 ("constitutionally defective performance of counsel may satisfy the cause requirement"); *Foster v. Miller*, 2007 WL 1893726 at * 10 (S.D.N.Y. 6/29/07) (unpublished); *Chipman v. Morgan,* 2007 WL 185003 at ** 9-10 (E.D.Ky. 1/19/07) (unpublished); *supra* n. 9.

In fact, that option is established law in the Eleventh Circuit. *U.S. v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) ("Ineffective assistance of counsel may satisfy the cause [and prejudice] exception to a procedural bar. In order to do so, however, the claim of ineffective assistance must have merit").

So it is mystifying, then, that both the state habeas court and the Respondent here essentially ignore it. And in the state court Blankenship clearly claimed IAC on his counsel's failure to object about these sentencing issues. Doc. # 7-81 at 21-22. He also has shown that his IAC claim is exhausted, doc. # 12 at 7, and he argues cause and prejudice here. Doc. # 14 at 103-13; # 12 at 11 ("The ineffective assistance of [petitioner's] counsel constitutes cause to excuse any default, and the merits of the issues would establish prejudice to petitioner").

It is black letter law that showing IAC

may satisfy the cause exception to a procedural bar. *Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir. 1989). In order to do so, however, the claim of ineffective assistance must have merit. *Id.* To determine whether it does, we must decide whether the arguments the defendant alleges his counsel failed to raise were significant enough to have

affected the outcome of his appeal. *Miller v. Dugger*, 858 F.2d 1536, 1538 (11th Cir. 1988).

*Nyhuis*, 211 F.3d at 1344, cited in *Brown v. U.S*., 2007 WL 2900580 at * 4 (11th Cir. 10/4/07) (unpublished). That means that *this Court* "must decide whether the arguments [Blankenship] alleges his counsel failed to raise were significant enough to have affected the outcome of his [direct, state supreme court] appeal." *Nyhuis*, 211 F.3d at 1344. And that, in turn, ordinarily requires examination of each claim, most notably, *why* resentencing counsel failed to object to, and thus seek correction of, the jury-instructions alleged to be constitutionally deficient now (*i.e.*, whether any act or omission, such as the failure to object to a charge, was a reasonable strategic decision or simply an unthinking blunder, *see, e.g., Owens v. State*, ___ Ga.App. ___, 2007 WL 3378673 at * 3 (11/15/07)).

Courts apply a presumption of reasonable trial strategy when reviewing trial counsel's failure to object to something, and thus it is up to petitioners like him to cite evidence rebutting that presumption. *E.g.*:

At the motion for new trial hearing, trial counsel was not questioned about his failure to object.... Without trial counsel's testimony regarding this issue, we cannot assume that counsel's actions did not fall "within the wide range of reasonable professional assistance" that is presumed by *Strickland*. *Strickland, supra*, 466 U.S. at 689. "Informed strategic decisions do not constitute ineffective legal assistance." *Phillips v. State*, 277 Ga. 161, 163-164 (b) (587 SE2d 45) (2003).

*Jackson v. State*, ___ Ga.App. ___, 2007 WL

3379682 at * 2 (11/15/07); *Jones*, 436 F.3d at 1293 (if the record is not complete regarding defense counsel's actions, for purpose of an IAC claim, the reviewing court should presume that what the particular defense lawyer did at trial, for example, what witnesses he presented or did not present, were acts that some reasonable lawyer might do); 16A Fed.Proc.,L.Ed. § 41:320 (*Determination of cause and prejudice*) (Nov. 2007) ("Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced").

Here Blankenship cites to *no* trial counsel testimony regarding these specific issues, so, like the *Jackson* court, this Court also cannot assume that counsel's actions did not fall "within the wide range of reasonable professional assistance" that is presumed by *Strickland*. *Strickland, supra*, 466 U.S. at 689. Therefore, petitioner has failed to show the IAC necessary to support the cause and prejudice he alleges to overcome the State's procedural default defense on this raft of claims. It follows that his "aggravating circumstances" claims are procedurally defaulted and thus denied.

### 3. *Recharge Instruction*

The State concedes that Blankenship's "recharge-instruction" claim is not procedurally defaulted. Doc. # 15 at 88. Shortly after it began deliberating, the resentencing jury inquired whether it could "have all the evidence that was introduced at the previous trial," and it was told no. Doc. # 22-3 at 78 (printed page 515). Later, it was brought back into the courtroom and its foreman stated:

[FOREMAN]: Yes, sir, Your Honor. We wanted to hear your charge again on explaining the - exactly what the torture

and the aggravating circumstances and the paragraph, too. The definitions for those.

THE COURT: One of the contentions of the state is that the murder was outrageously or wantonly vile, horrible or inhumane in that it involved torture, depravity of mind or aggravated battery to the victim. Now, you want those terms...

[FOREMAN]: Yes, sir. You went on to explain further.

THE COURT: All right. The state has the burden of proving this statutory aggravating circumstance beyond a reasonable doubt. In this regard the state must prove you your satisfaction [sic] and beyond a reasonable doubt, first, that the offense of murder was outrageously or wantonly vile, horrible or inhuman and second that it involved at least one of the following; torture, or depravity of mind or an aggravated battery to the victim. Now, an aggravated battery occurs when a person causes, maliciously causes bodily harm to another by depriving him or her of a member of her or his body by rendering a member of her body or his body useless or by seriously disfiguring her body or his body or a member thereof. In order to find that the offense of murder involved a aggravated battery you must find that the bodily harm to the victim occurred before death.

I charge you that torture occurs when a living person is subjected to the unnecessary and wanton infliction of severe physical or mental pain, agony or anguish. I charge you however that you would not be authorized to find that the offense of murder involved torture simply because the victim suffered pain or briefly

anticipated the prospect of death. Nor should acts committed upon the body of a deceased victim support a finding of torture.

   In order to find that the offense of murder involved torture you must find that the defendant intentionally, unnecessarily and wantonly inflicted severe physical or mental pain, agony or anguish upon a living victim.

   I charge you that depravity of mind is a reflection of an utterly corrupt, perverted or immoral state of mind. In determining whether or not the offense of murder in this case involved of murder involved depravity of mind on the part of the defendant you may consider the age and the physical characteristics of the victim and you may consider the actions of the defendant prior to and after the commission of the murder. In order to find that the offense of murder involved depravity of mind you must find that the defendant as a result of his utter corruption, perversion or immorality committed aggravated battery or torture upon a living person.

Doc. # 22-3 at 79-81 (printed page 516-18).

After giving that re-charge, the court overruled trial counsel's objection "to recharging only as to the aggravating circumstances on the grounds that it merely tends to overly emphasize those items that the jury may use in its determination without at the same time recharging the mitigating circumstances." Doc. # 22-3 at 81.

Blankenship renews that argument before this Court. Doc. # 14 at 105-06. The state habeas court stood on state law -- that the trial judge is vested with sound discretion, which was not abused here, to restrict instructions to the specific request of the jury. Respondent correctly notes that Blankenship "has provided no Supreme Court precedent governing the state habeas corpus court's review of whether a recharge should have been given and the content of that recharge," doc. # 15 at 89, so this Court cannot say that the state court's decision is contrary to or an unreasonable application of applicable Supreme Court precedent. This claim, then, also is denied.

### 4. *"Sandstrom"* Error

   Blankenship raises another *Sandstrom* error claim -- that the resentencing court's jury charge impermissibly shifted the burden of proof with respect to intent, and thereby permitted the prosecution to prove its case without establishing the essential elements of the offense beyond a reasonable doubt. Doc. # 14 at 108. He points to this section of that court's charge:

   I charge you that a person will not be presumed to act with criminal intent but the jury may find such intention or the absence thereof upon a consideratin [sic] of words, conduct, demeanor, motive and other circumstances connected with the act for which the accused is being prosecuted.

   You may infer in this case if you wish to do so that the acts of a person of sound mind and discretion are the product of his will and you may infer if you wish to do so that a person of sound mind and discretion *intends* the natural and probable consequences of his acts. Whether you make such inference or inferences in this case is a matter soley [sic] within the discretion of the jury.

Doc. # 22-3 at 70 (printed page 507) (emphasis added); # 14 at 109. Petitioner insists that this charge is substantially similar to that condemned by *Francis v. Franklin*, 471 U.S. 307 (1985), because it created a constitutionally impermissible mandatory presumption on the element of intent. Doc. # 14 at 109.

The State again raises procedural default *and* cites the state habeas court's ruling that "the trial court did charge that the state had the burden of proving aggravating circumstances beyond a reasonable doubt." Doc. # 15 at 89-90; *see also* doc. # 7-78 at 3 ¶ 7, 9 (state habeas court rulings). Evidently, the State reasons that whatever *Sandstrom/Francis*, burden-shifting error the above passage presents, the resentencing court sufficiently emphasized the prosecution's burden to prove the aggravating circumstances beyond a reasonable doubt.

In *Sandstrom* and *Francis*, "the Supreme Court cautioned that the words 'presume' or 'presumption' imply a mandatory finding, not merely a permissive inference the jury may or may not draw. *Francis*, 471 U.S. at 316...." *Jones*, 436 F.3d at 1301. The *Jones* court cited *Yates v. Evatt*, 500 U.S. 391 (1991), in illuminating what constitutes harmless error on *Sandstrom* claims:

> To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. Thus, to say that an instruction to apply an unconstitutional presumption did not contribute to the verdict is to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently

of the presumption.

*Jones*, 436 F.3d at 1302 (quoting *Yates*, 500 U.S. at 403).

The state court here, then, was obligated to analyze "whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." *Id.* In *Jones*, the evidence was *that* overwhelming. 436 F.3d at 1303.

The same can be said here. Once again, Blankenship *admitted* being in the victim's room at the time of her attack, and the jury was entitled to dismiss as childishly outlandish his claim that someone else was present but he "promised" his deity that he would never say. This Court cannot say that the state habeas court unreasonably applied federal constitutional law on this claim, so it is denied.

### 5. *"Mills"* Error

Blankenship next points to this portion of the resentencing court's instructions:

> If you fix the penalty of the accused at death he will be sentenced to death.
>
> If you find that the defendant should receive mercy, the form of your verdict would be, we the jury recommend mercy. If you so find, the defendant will be sentenced to life imprisonment.
>
> *Whatever your verdict might be it must be unanimous, in writing, signed by one of you as foreman and returned into court.*

Doc. # 22-3 at 75 (printed page 512) (emphasis

added); doc. # 14 at 111. This, Blankenship contends, violates O.C.G.A. § 17-10-31 (requiring unanimity on at least one aggravating circumstance before a death sentence can be imposed) and constitutes a *Mills* error in that the instruction misled the jury that it must unanimously vote on a life sentence. Doc. # 14 at 111. He also cites, *inter alia*, *McKoy v. North Carolina*, 494 U.S. 433 (1990), in reminding this Court that it is error for a trial court to instruct juries to disregard mitigating factors not found unanimously in capital sentencing cases. Doc. # 14 at 111-12.

However, neither *Mills* nor *McKoy* -- both of which were handed down *after* the 1986 resentencing trial that occurred here, apply retroactively to Blankenship's case. *Beard v. Banks*, 542 U.S. 406, 420-21 (2004) (*Mills* is not retroactive to collateral appeals), cited in *Whorton v. Bockting*, 127 S.Ct. 1173, 1182 (2007) (collecting non-retroactivity cases); *Thomas v. Jones*, 742 F.Supp. 598, 601-02 (S.D.Ala. 1990) (neither *Mills* nor *McKoy* can be applied retroactively in collateral proceedings); *Jefferson II*, 490 F.Supp.2d at 1310-11. This claim then, too, must be denied.

## O. *"Witherspoon"* Claim

The gist of *Witherspoon* and its progeny is that, during jury selection, a capital defendant should be able to fairly deeply probe those who will decide whether he lives or dies. *See, e.g.*, *Uttecht*, 127 S.Ct. at 2222-24. So, an impatient trial judge -- alleged to have been the case here, doc. # 14 at 120-24 -- can sow reversible error into the trial by superficially examining, then excusing jurors who articulate only a *general* opposition to the death penalty, rather than a belief which "prevent[s] or substantially impair[s] the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 420

(1985). The *Uttecht* Court identified

at least four principles of relevance here. First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Witherspoon*, 391 U.S., at 521, 88 S.Ct. 1770. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. *Witt*, 469 U.S., at 416, 105 S.Ct. 844. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. *Id.*, at 424, 105 S.Ct. 844. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts. *Id.*, at 424-434, 105 S.Ct. 844.

*Uttecht*, 127 S.Ct. at 2224; *Morales*, 2007 WL 3225397 at * 23-25.

The state habeas court applied procedural default because Blankenship had raised these claims on direct appeal. Doc. # 7-78 at 4 ¶ 18 ("18. Witherspoon error"), 5 (ground # 18 not considered). The state supreme court had ruled that he waived objection to three excused jurors, *Blankenship*, 258 Ga. at 43-44, and the State here stands on waiver and procedural default defenses. Doc. # 15 at 91-95. Inexplicably, petitioner contends that he has *exhausted* this cluster of claims, doc. # 12 at 10, and that IAC supplies cause and prejudice to overcome

procedural default, *id.* at 11-16, but he then *never does* make a cause and prejudice showing on these claims. *Id.* (enumerating his claims). The same must be said for "Claim X" (improper admission of criminal history), *see* doc. # 15 at 95, doc. # 12 at 11-18, so both Claims IX (*Witherspoon*) and Claim X (criminal history) are also denied.

### P. "Short-Timing" Claim

Next, Blankenship argues that the resentencing court impermissibly restricted his opportunity to present mitigation evidence by unduly restricting the trial's length. Doc. # 14 at 138-42. He quotes only the italicized portion of the following colloquy:

> THE COURT: Well, I'll tell you. I went down to Macon [Georgia] or up to Macon to hold court one time and we didn't finish and I held court on Saturday and Sunday. *I'm just putting you on notice right now that this case has to be finished this week. If not we will hold court on saturday and sunday.* [sic].

> [PROSECUTOR]: Your Honor, that would be fine with the state. I don't anticipate that we would go anytime -- I'm not sure we will go to Friday but, then again, the defense is going to be presenting most of that evidence.

> MR. HENDRIX: I think that that would be the best way to handle it. Run it until we are through.

Doc. # 7-45 at 9 (emphasis added); doc. # 14 at 141. It is not necessary to reach the State's argument that this claim is unexhausted and thus defaulted, doc. # 15 at 96, because it is without merit. All the trial judge stated was that the trial would continue through the

weekend, and there is no showing in the record that resentencing counsel felt time-pinched, or otherwise restricted, from presenting all of the mitigation evidence they wanted.

### Q. "Cruel and Unusual Punishment"

#### 1. *Duration-Based Claim*

In Claim XIII Blankenship argues that being on death row for more than a quarter of century is *itself* cruel and unusual punishment. Doc. # 14 at 143-57. The Court disagrees with the State (doc. # 15 at 96-98) that he is subject to the state law, successive-writ bar, *see* doc. # 7-102 at 16 (state habeas judge expressly reached it on the merits), but petitioner nevertheless has failed to show that the state habeas court unreasonably applied U.S. Supreme Court precedent here (indeed, he cites *no* such precedent), so no unreasonable application of federal precedent can be shown here. Thus, this claim also must be denied, and Blankenship's *Jefferson*-type "*Chudasma*" complaint (he complains that the state habeas judge ruled on the merits but then signed an order, drafted by *State's* counsel, that denied it on successiveness grounds, doc. # 14 at 155-57), is moot.

It is worth noting, however, that Blankenship's victim remains dead *forever*, and it thus seems unlikely that the U.S. Supreme Court would anytime soon recognize a right to avoid execution merely because habeas petitioners can game and clog courts with execution-delaying, *voluminous* filings.

#### 2. *Method-Of-Execution Claim*

Finally, Blankenship argues that Georgia's current method of carrying out its death penalty -- via lethal injection -- violates his Eighth and Fourteenth Amendment rights against cruel and unusual punishment. Doc. # 14 at 158-185. The

State points out, and Blankenship agrees, that he presented an *electric-chair* based claim in the state courts but now (understandably, since things have changed)[31] raises a *lethal-injection* based challenge.

Yet, he did not raise this claim here until *after* he filed his petition. Doc. # 1; # 14 at 159 n. 43; # 15 at 99. Blankenship explains that, prior to filing his petition here, Georgia changed its method of execution (from electric chair to lethal injection) and he initially did not bring this claim in state court, nor initially here, due to the paucity of information to substantiate it. Doc. # 14 at 159 n. 43.

Now, however, there is more information to support this claim, so he is raising it in his supporting brief. *Id.* If this Court will not permit him to amend, or if it determines that the claim is unexhausted, then Blankenship seeks to withdraw it. *Id.*

There is some support for what Blankenship argues here. *See, e.g., Schwab v. State*, ___ So.2d ___, 2007 WL 3196523 at * 1 (Fla. 11/1/07) (defendant's failure to raise his Eighth Amendment objection to lethal injection as method of execution within one year of time lethal injection became a method of execution did not bar him from raising his postconviction challenge; his claim was based on prolonged death in execution of another prisoner and the resulting new protocols for lethal injection, which did not exist when lethal injection was first authorized). And the claim also has found footing elsewhere. *See generally* Ann., *Substantive Challenges to Propriety of* *Execution by Lethal Injection in State Capital Proceedings*, 21 A.L.R.6TH 1 (2007).[32]

On top of that, the U.S. Supreme Court has just granted a stay in a lethal-injection challenge that the Eleventh Circuit had refused. *Schwab v. Secretary, Dept. of Corrections*, ___ F.3d ___, 2007 WL 3375242 (11th Cir. 11/15/07), *stay granted, Schwab v. Florida*, ___ U.S. ___ 2007 WL 3380059 ( 11/15/07); *see also Baze v. Rees,* 128 S.Ct. 34 (2007).

Blankenship's "footnote-motion" to amend this, his first federal habeas petition,

> is governed by Federal Rule of Civil Procedure 15(c) ("Relation Back of Amendments"). *See Mayle v. Felix*, 545 U.S. 644, 654-44, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005) (applying Rule 15(c) to determine whether the request to the amend habeas petition should be granted); *see also Pruitt v. United States*, 274 F.3d 1315, 1317 (11th Cir. 2001) (even when the habeas petition was filed before AEDPA was enacted, the question whether leave to amend should be granted is determined by applying Rule 15(c)). An amendment "relates back" to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). Rule 15(c) is not meant

---

[31] "In 2001, [Georgia's] General Assembly amended OCGA § 17-10-38 to provide that lethal injection would replace electrocution as [the] State's method of execution." *Humphrey v. Wilson*, ___ Ga.___, 2007 WL 3118862 at * 5 (10/26/07).

[32] Some have challenged lethal injection under 42 U.S.C. § 1983. *See Arthur v. King*, 500 F.3d 1335, 1337 (11th Cir. 2007); *Williams v. Allen*, 2007 WL 2022013 at * 1-2 (M.D.Ala. 7/10/07) (unpublished). Timeliness issues abound in those cases, however. *See generally* Ann., *Timeliness of Challenge, Under 42 U.S.C.A. § 1983, to Constitutionality of State Executions by Lethal Injection*, 22 A.L.R.6TH 19 (2007).

to be "so broad as to allow an amended pleading to add an entirely new claim based on a different set of facts." *Dean v. United States*, 278 F.3d 1218, 1221 (11th Cir.2002).

*Smith v. Secretary, Dept. of Corrections*, 2007 WL 2302207 at * 31 (M.D.Fla. 8/8/07) (unpublished). *Rhines v. Weber*, 544 U.S. 269 (2005), instructs that this Court would abuse its discretion were it "to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that [he] engaged in intentionally dilatory litigation tactics. In such circumstances, the district court should stay, rather than dismiss, the mixed petition." *Id.* at 278.

Blankenship's claim is entirely new and does not relate back to any other claim he has previously raised. In addition, the Georgia Supreme Court has passed on this claim, apparently on the same evidence Blankenship cites here. Doc. # 14 at 162-72 (citing 2002 hearing evidence in "*State v. Michael Wayne Nance*, Indictment No. 95-B-2461-4"); *Nance v. State,* 280 Ga. 125, 127 (2005) ("After conducting hearings on the procedures employed by the State of Georgia while carrying out an execution by lethal injection, the trial court ruled that these procedures are not unconstitutional. We find no error").

Blankenship also cites *Taylor v. Crawford*, 2006 WL 1779035 (W.D.Mo. 6/26/06) (unpublished) to assist him here, noting that the *Taylor* court held that further executions using Missouri's similar (to Georgia's) lethal-injection method shall be stayed pending rectification of the execution process. Doc. # 14 at 1173-74. However, since Blankenship filed his brief *Taylor* was reversed by the Eighth Circuit, *Taylor v. Crawford*, 487 F.3d 1072, 1082-85 (8th Cir. 2007) (state's lethal injection protocol did not involve substantial foreseeable risk of wanton infliction of pain, and thus did not have to mandate participation of anesthesiologist or additional monitoring equipment in order to comport with Eighth Amendment's ban on cruel and unusual punishment; written protocol called for ample quantity of thiopental to cause unconsciousness, and mandated medical supervision by physician, emergency medical technician or nurse, including examination to confirm unconsciousness prior to third injection), *cert pet. filed*, 76 USLW 3094 (9/5/07).

Petitioner cites other cases from other states, doc. # 14 at 174-79, and the Court has located some of its own, *see, e.g., Harbison v. Little*, 511 F.Supp.2d 872, 903 (M.D.Tenn. 2007) ("the court finds that the plaintiff's pending execution under Tennessee's new lethal injection protocol violates the Eighth Amendment to the United States Constitution. The new protocol presents a substantial risk of unnecessary pain; that risk was known to Commissioner Little, and yet disregarded ... [the state thus was barred] from executing the plaintiff under the new protocol"). And again, the aforementioned *Schwab* case has been stayed by the U.S. Supreme Court.

In light of this background, the Court finds it significant that the State argues only that this claim is unexhausted, but not otherwise waived. Doc. # 15 at 99. The Court exercises its discretion to grant Blankenship's "footnote motion" (doc. # 14 at 159-60 n. 43) to simply withdraw this claim from his petition.

## R. Abandoned Claims

This Court repeatedly instructed Blankenship to *fully brief* all of his claims. Doc. ## 8, 13. It did so because mere recitation in a petition,

unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments -- hence, *litigate* -- on a petitioner's behalf. Federal judges cannot litigate on behalf of the parties before them, *U.S. v. Burkhalter*, 966 F.Supp. 1223, 1225 n. 4 (S.D.Ga. 1997); *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) ("legal parameters of a given dispute are framed by the positions advanced by the adversaries, and may not be expanded *sua sponte* by the trial judge") (internal quotes and cite omitted), and it is for this reason that any claims in Blankenship's petition that were not argued in his brief are abandoned.

## S. Discovery

The gist of Blankenship's reconsideration motion (doc. # 21) on this Court's previous denial (doc. # 20) of his discovery motion is this:

There is reason to believe that if the facts are fully developed, [petitioner] may be able to demonstrate he is entitled to relief on his ineffectiveness claim because there is a reasonable probability that the jury would not have sentenced Mr. Blankenship to death had counsel presented evidence that semen recovered from the victim did not belong to [him].

Doc. # 21 at 4 ¶ 2.

What Blankenship seeks to develop, however, is further detail on the forensics of this case, and this directs the Court's attention primarily to state crime lab forensic serologist Linda Tillman's resentencing trial testimony. She testified that (a) all humans have an A, B, O, or AB blood type; (b) 80% of male semen can be typed just as a blood sample can be typed; (c) 80% of the population secretes, into their seminal or vaginal fluid, the same substance as exists in their blood; 20% are "non-secretors," so a serologist "would not be able to get a type from their body fluids"; (d) Tillman analyzed the victim's blood, anal and oral fluids, along with Blankenship's blood and saliva samples; (e) the victim's blood was type O and she was a "secretor"; (f) Blankenship's blood was type O and he also was a "secretor"; the victim's blood scrapings were type O and there was no way to distinguish from whom the blood came from given the common blood types; (g) approximately 44% of the population is type O; approximately 35% of the population, then, could be "O" type secretors; (h) there was sperm in the victim's vaginal and anal, but not her oral swabbings; (i) the seminal fluid found in the vaginal smear was "O" type and thus could have come from a secretor; (j) "Or it could have come from a non-secretor who did not leave blood typing"; (k) type O individuals have an "H-reactive" protein substance that causes them to be classified type O; (l) a type O secetor, then, will leave the H reactive protein in their fluids left at a crime scene; (m) with seminal fluid, typing serologists like Tillman did not have all of the different blood grouping factors that "are available even with blood typing," so the identification process was limited in that regard; (n) Gary Nelson also was a type O secretor; (o) Tillman also found "[i]n the blood set of blood scrapings [taken from the crime scene] a type B substance present in ... blood type B people. But I did not have enough of the same to perform an adequate repeat of the work to assure that this was an indication of type B blood. But it is a possibility"; (p) "type B blood wouldn't be found in somebody with type O blood"; (q) it therefore "would be possible ... that there was an individual [at the crime scene] with Type B non-secretor..."; (r) "[s]o it would be possible that the ... B type ... found under Mrs. Bowen's fingernails, that that person [was] a non-secretor, that could account for everything that [Tillman]

found in ... [her] test results"; (s) yet, Tillman could not say definitively that there was any type B blood present on the victim, and in any event it could have been on her fingernails prior to the crime, assuming inadequate hygiene. Doc. # 22-2 at 19-37 (printed pages 378-394).

Blankenship wants to further probe the "likelihood that the semen does not belong to" him, and this is supported, he contends, "by evidence of [an] unidentified antigen under the fingernails of the victim and unidentified hair and fibers in the pubic combings of the victim, none of which belonged to [him]." Doc. # 21 at 4. Plus, he maintains, the "semen recovered from the victim in this case has never been isolated from [the] vaginal fluid and tested separately." *Id.*

And "[d]espite being standard police procedure," he further argues, "the hair and fiber samples recovered from the victim's combings were never subjected to comparison analysis." *Id.* Too, "[t]he Georgia Supreme Court acknowledged that the physical evidence did support the involvement of another perpetrator." *Id.* (citing *Blankenship,* 251 Ga. at 622). He quotes this *Blankenship* passage:

> In our review of the evidence, we noted the unexplained presence of blood, which was neither the victim's nor the defendant's, in the fingernail scrapings taken from the victim's left hand. We noted also that a segment of Negroid hair was discovered in combings taken from the victim's pubic hair, for the presence of which a plausible, though not conclusive, explanation was offered by the state.[33]

We concluded, from our review of the evidence, including footprint and fingerprint evidence and the defendant's confession, that the evidence was sufficient to support the convictions. However, in our review of the evidence, it was not necessary to determine, nor did we, that the evidence left no doubt as to the possible involvement of a third party.

*Blankenship,* 251 Ga. at 622 (footnote added); doc. # 17 at 2.

The State has not responded to Blankenship's reconsideration motion, but its original discovery-motion opposition brief, doc. # 18, is lengthy and comprehensive. There it literally *invites* Blankenship to pursue DNA testing under O.C.G.A. § 5-5-41:

> Petitioner has an available remedy in state court to seek post-conviction DNA testing, Petitioner can utilize Georgia's Post-Conviction DNA statute as contained in O.C.G.A. § 5-5-41, which allows post-conviction DNA testing in cases where DNA evidence was not available at the time of trial, when a defendant meets the "reasonable probability test." *See Crawford v. State,* 278 Ga. 95, 96-97 (2004) (upholding validity of test requiring that a petitioner establish "reasonable probability [DNA test results] would have

---

[33] *See* doc. # 22 at 28, 59-60 (one of the two men responsible for moving the victim's body from the crime scene was black, and a morgue attendant at the autopsy was black). Blankenship complains that the State failed to follow standard procedure "to eliminate all possibilities by determining who came into contact with the body, taking hair samples, and attempting to identify the unknown hairs by comparing them with the known samples." Doc. # 17 at 4 n. 2. And resentencing counsel were ineffective for pursuing a residual doubt theory -- by plying the "second man" theory -- without pressing the State for better forensics such as that which Blankenship now seeks to discover here. *Id.* at 4-5 (citing counsel's "failure to seek independent testing and analysis of the semen (testing which the State itself did not conduct)....").

led to his acquittal if those results had been available at his original trial").

Doc. # 18 at 17.

*Crawford* authorizes DNA testing if there is shown a reasonable probability that, with such DNA results, Blankenship might have received "a sentence less than death." 278 Ga. at 406; *see also State v. Clark*, 273 Ga.App. 411 (2005) (procedural aspects of DNA-testing motions); 11 GA. PROC. CRIMINAL PROCEDURE § 25:28 (*DNA*) (Nov. 2007).

Given the State's open invitation, and Blankenship's failure to accept it (the State filed that brief a year ago and no one has informed the Court that petitioner has since invoked the option), Blankenship has shown no "good cause" within the meaning of ¶ 2254 Rule 6, as discussed in this Court's 4/18/06 Order. Doc. # 8 at 4-5. In light of the State's invitation, and the fact that Blankenship does not need this Court's permission to pursue DNA testing (which was not technologically available at the time of the 1986 resentencing trial), his discovery-reconsideration motion is denied, for the State evidently is confident that the DNA testing Blankenship pursues will produce no new evidence to assist him.[34]

IV. **CONCLUSION**

Petitioner Roy Willard Blankenship's habeas petition (doc. # 1) is ***DENIED,*** as is his discovery-reconsideration motion. Doc. # 21.

This  14  day of December, 2007.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[34] Nor will this Court grant him a stay of execution, for his appeal to the Eleventh Circuit plus any DNA motion in state court will afford him ample time and opportunity to seek that relief in those forums.